**GROTRIAN, HELFFERICH, SCHULZ, TH. STEINWEG NACHF.,** Plaintiff-Appellant,

v.

**STEINWAY & SONS,** Defendant-Appellee.

No. 170, Docket 74–1397.

United States Court of Appeals, Second Circuit.

Argued Jan. 10, 1975.

Decided July 9, 1975.

Dean A. Olds, Chicago, Ill. (Richard H. Compere, Jerold A. Jacover, and Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Chicago, Ill., and V. T. Giordano, and von Maltitz, Derenberg, Kunin & Janssen, New York City, on the brief), for plaintiff-appellant.

Granville M. Pine, New York City (Harry C. Marcus, Kurt E. Richter, Arnold I. Rady, and Morgan, Finnegan, Durham & Pine, New York City, on the brief), for defendant-appellee.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal from a judgment entered November 28, 1973 after a bench trial in the Southern District of New York, Lloyd F. MacMahon, *District Judge*, 365 F.Supp. 707, the essential issues are:

(1) Whether the district court correctly held that plaintiff consciously and intentionally had infringed defendant's trademarks and had competed unfairly with defendant.

(2) Whether the scope of relief granted to defendant by the district court was overly broad.

For the reasons below, we affirm the judgment in favor of defendant with respect to plaintiff's infringement and unfair competition; we affirm the dismissal of the complaint; but we modify the judgment to vacate the award to defendant of damages resulting from plaintiff's infringement of defendant's trademark rights in the United States and the award to defendant of plaintiff's profits from sales of pianos in the United States. We affirm the judgment as modified.

I.

This is not a case for music lovers. It involves not the dulcet sounds one expects from concert grand pianos, but the discordant notes from a cacophony for pianos extending back more than a century.

To understand the essential issues on this appeal and our rulings thereon, we believe that it may be helpful to summarize the relationship between the parties to this action, substantially as found by the district court. 365 F.Supp. at 709–12.[1]

In 1835 Heinrich E. Steinweg began making pianos in Germany. He emigrated to New York in 1850 with three sons, changed his name to Steinway and founded appellee Steinway & Sons

---

1. Appellant vigorously challenges certain aspects of the district court's statement of the historical relationship between the parties. See pp. 1337 and 1343, *infra*, and note 2, *infra*.

(hereinafter Steinway). Heinrich's oldest son, C. F. Theodor Steinweg, remained in Germany. He began to make pianos under his own name. Later he sold his business to his three employees, Wilhelm Grotrian, Adolph Helfferich and H. G. W. Schulz. Theodor then moved to New York and joined Steinway & Sons as a partner in 1866.

The sale of the business to Messrs. Grotrian, Helfferich and Schulz included the right to use the name "C. F. Th. Steinweg Nachf. (Successors to C. F. Theodor Steinweg)" for ten years.[2] The name later was changed to "Grotrian, Helfferich, Schulz, Th. Steinweg Nachf.", the present corporate name of appellant (hereinafter Grotrian).

Grotrian thereafter registered the trademarks "Grotrian-Steinweg" and "Steinweg" in Germany. The latter mark was cancelled as a result of a suit by Steinway against Grotrian. In December 1918, shortly after the Armistice, the Grotrian family, owners of the firm, petitioned German officials to change its name to "Steinweg, or at least Grotrian Steinweg". One of the principal reasons was to aid in the export of its product. The petition was granted to the extent of changing the name to "Grotrian-Steinweg".

Grotrian first entered the American market in 1925. From 1926 through 1928 it sold a total of 25 pianos in the United States. When Steinway learned of this in 1928, it protested, claiming that the use of the mark "Grotrian-Steinweg" on pianos infringed its trade names "Steinway" and "Steinway & Sons". It demanded that use of the "Grotrian-Steinweg" mark be discontinued on pianos in the United States. Undeterred, Grotrian increased its shipments to 47 in 1929.

William Steinway, an officer of appellee, decided to confront Grotrian face to face. He went to Germany in 1929. A settlement was reached, symbolized by William Steinway's smoking of a cigar with Grotrian's principal owner (the "peace cigar settlement"). Thereafter Grotrian's American activities dwindled. Between 1932 and 1952 no Grotrian-Steinweg pianos were exported to the United States.

In 1952 Grotrian reentered the American market on a mail order basis. For the next 20 years it regularly exported a small number of pianos (a total of 458) to the United States and distributed them through small local dealers. Grotrian never made any pianos in the United States. It did not employ an advertising agency or require advertising by its United States dealers, although the latter were supplied with promotional material. No representative of Grotrian ever came to the United States from 1929 to 1966.

Although Steinway learned of Grotrian exports to the United States as early as 1957, it did nothing until 1967. In January of that year Grotrian entered into a distributing agreement with the Wurlitzer Company (hereinafter Wurlitzer), under which the latter agreed to use its best efforts to sell "Grotrian-Steinweg" pianos in the United States for five years. Wurlitzer issued a press release in July announcing that the world famous "Grotrian-Steinweg" piano would soon be sold in Wurlitzer stores. Steinway promptly threatened Wurlitzer with legal action to prevent the sale in the United States of pianos with the "Grotrian-Steinweg" name. Wurlitzer decided that it could not sell the pianos profitably without using the Grotrian-Steinweg name. On advice of counsel, it cancelled the distribution contract on November 21, 1967.

No legal action was taken by Steinway or Grotrian regarding the latter's export of pianos to the United States until July 29, 1969. On that date Grotrian commenced the instant action against Steinway, apparently in response to Steinway's opposition to Grotrian's application for registration in the United States of

---

**2.** Appellant claims that this right was unlimited.

the trademark "Grotrian-Steinweg".[3] Grotrian's complaint [4] sought a declaratory judgment: (1) that its trademark "Grotrian-Steinweg" and corporate name did not conflict with appellee's trademarks "Steinway & Sons" and "Steinway"; (2) that Grotrian's use of its trademark and corporate name in the United States did not infringe Steinway's trademark rights and did not constitute unfair competition; (3) that Steinway was estopped by laches from asserting any claim of conflict between the respective marks or between the names of appellant and appellee; and (4) that Grotrian had the right to use its trademark and corporate name free from interference by Steinway in the United States or in any foreign country where the activities of Grotrian or Steinway have a substantial effect on interstate or foreign commerce. Grotrian also sought an injunction to enjoin Steinway from interfering or threatening to interfere with Grotrian's use of its trademark and corporate name and from instituting suit anywhere in the world challenging Grotrian's right to use its trademark or corporate name. Grotrian also sought $93,-000 damages for tortious interference with its contractual relationship with Wurlitzer, plus attorneys fees.

Steinway's answer in substance denied the factual allegations of the complaint. It also counterclaimed under the Federal Trade-Mark Act (Lanham Act), 15 U.S.C. §§ 1051–1127 (1970), and under common law, for trademark infringement and unfair competition. An injunction was sought to enjoin Grotrian: (1) from using the word "Steinweg" alone or in conjunction with any other words or symbols; (2) from using the name "Grotrian-Steinweg" in connection with the sale of pianos in the United States; (3) from infringing Steinway's trademarks; [5] (4) from competing unfairly with Steinway; and (5) from prosecuting any application for registration of trademarks in the United States Patent Office. Steinway also sought an accounting for all profits Grotrian had received by reason of its illegal activities, compensatory and punitive damages for injuries sustained by Steinway as a result of those activities, plus attorneys fees.

Grotrian's reply in substance denied the allegations of Steinway's counterclaim and pleaded the defenses of laches and unclean hands.

After a bench trial, the district court in an opinion filed October 1, 1973 concluded that "[Grotrian] is infringing [Steinway's] trademarks Steinway and Steinway & Sons because the name Grotrian-Steinweg is likely to cause confusion, mistake or deception" in violation of the Lanham Act, 15 U.S.C. § 1114(1) (1970),[6] 365 F.Supp. at 720; that the use of Grotrian's names in the United States constituted unfair competition against Steinway, *id.* at 721; and that Steinway's counterclaim was not barred by laches because Grotrian had not been

---

**3.** On September 11, 1967, Grotrian filed an application, Serial No. 280,051, in the United States Patent Office, seeking registration of its trademark, "Grotrian-Steinweg", and design. After publication on February 25, 1969 for opposition in the Official Gazette of the Patent Office, Steinway filed a Notice of Opposition on March 19, 1969.

**4.** Jurisdiction was founded on the Federal Trade-Mark Act (Lanham Act), 15 U.S.C. §§ 1051–1127 (1970), and 28 U.S.C. §§ 1331, 1332 and 1338 (1970).

**5.** Steinway's registered trademarks include: "Steinway & Sons", Trademark Registration No. 45,846 (August 29, 1905); "Steinway", Trademark Registration No. 141,687 (April 26, 1921); and "Steinway—The Instrument of the Immortals", Trademark Registration No. 285–732 (August 4, 1931).

**6.** 15 U.S.C. § 1114(1) (1970) provides in pertinent part:

"Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive

\* \* \*

shall be liable in a civil action by the registrant . . . ."

prejudiced. *Id.* at 721. Accordingly, the court permanently enjoined Grotrian from infringing Steinway's trademark rights. It ordered that Steinway recover from Grotrian damages for infringement and unfair competition and that Steinway recover Grotrian's profits from sales of pianos in the United States, together with the costs of the action. See 15 U.S.C. § 1117 (1970).[7] An accounting was ordered and a special master was appointed to determine the amount of damages and profits to which Steinway was entitled. The court denied all relief sought by Grotrian and dismissed its complaint.

## II.

We turn first to the district court's conclusion that Grotrian had infringed Steinway's trademarks and had engaged in unfair competition.

Trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (1970), see note 6, *supra*, occurs where the nonconsensual use of a colorable imitation of a valid mark is "likely to cause confusion, or to cause mistake, or to deceive."

In considering the issue of likelihood of confusion in the instant case, the district court weighed a number of factors, including:

"the strength of the Steinway marks; the alleged infringer's purpose in adopting its marks; the degree of similarity between the marks; the degree of similarity between the products;

the competitive proximity of the products; actual confusion; and the degree of care likely to be exercised by consumers." 365 F.Supp. at 712 (footnote omitted).

The court considered each of these seven factors, found against Grotrian and in favor of Steinway on each, and concluded that Grotrian consciously and intentionally had infringed Steinway's trademarks. 365 F.Supp. at 712–17, 720, 721.

Grotrian does not challenge the legal standard applied by the court below to determine infringement. That standard finds substantial support in our decisions. See, e. g., *B & L Associates* v. *H. Daroff & Sons, Inc.*, 421 F.2d 352, 354 (2 Cir.), *cert. denied*, 398 U.S. 952 (1970); *Kiki Undies Corp.* v. *Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1099 (2 Cir. 1969), *cert. dismissed*, 396 U.S. 1054 (1970); *Miss Universe, Inc.* v. *Patricelli*, 408 F.2d 506, 509 (2 Cir. 1969). Rather, Grotrian vigorously challenges the court's finding of a likelihood of confusion.[8]

(A) *Deliberate Intent to Infringe*

Grotrian first attacks as clearly erroneous the court's finding to the effect that Grotrian had a malicious purpose in adopting the mark "Grotrian-Steinweg". The essence of that finding is that, from the time Grotrian took over from Theodor Steinweg, both the firm and its owners have made continuous efforts to annex the name "Steinweg" to their own business so as to exploit its similarity to "Steinway" in the United States where

---

**7.** 15 U.S.C. § 1117 (1970) provides in pertinent part:

"When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action . . . . ."

**8.** Grotrian understandably does not challenge the court's findings as to the strength of Steinway's marks, the degree of similarity between

the products and the competitive proximity of the products.

It is beyond dispute that Steinway's mark "is strong and its name famous". 365 F.Supp. at 713. Counsel for Grotrian so conceded at trial.

Nor is there any basis for attacking the court's finding with respect to the degree of similarity and competitive proximity of the products—"the products are virtually identical and compete on a direct basis". 365 F.Supp. at 714. It is undisputed that the parties are in direct competition in terms of price range, type of instrument and quality. After all, that is what this case is all about.

Steinway has built up a very substantial reputation through advertising and word of mouth. As the court put it:

"The ancestral Grotrians candidly adopted the name Steinweg for the sole purpose of exploiting the Steinweg name in exporting pianos to English-speaking countries. Moreover, they did this despite knowledge of defendant's trademark and its objections. The conclusion, we think, is inescapable that plaintiff's owners adopted the name Steinweg as the dominant portion of plaintiff's trademark for the conscious and, indeed, avowed purpose of exploiting and trading on the good will and reputation of defendant. It would be difficult to conceive of a more deliberate intent of an infringer to imitate and palm off his products as those of another . . . ." 365 F.Supp. at 714 (footnote omitted).

The gravamen of Grotrian's contention on appeal is that the district court rewrote the history of the firm. It seems especially piqued that the court inferred bad faith from the family's name change. It argues that Grotrian-Steinweg pianos had been sold throughout the world prior to that time and the change was to preserve the name in the tumult following World War I. Grotrian points to three 1926 decisions of the German Supreme Court which it contends conclusively held: (1) that the Steinweg name was sold without limitation to Grotrian's predecessors; and (2) that the change of the family's name in 1919 to Grotrian-Steinweg was justified by decades of use' of the Steinweg name prior to that time. It urges that since Steinway was the plaintiff in those cases it is collaterally estopped from relitigating the factual issues there determined.

 Steinway contends that the authenticity of copies of the decisions offered by Grotrian was not sufficiently established to comply with Fed.R.Civ.P. 44(a)(2).[9] Steinway also challenges the accuracy of the translations of the decisions offered by Grotrian. It further contends that, even if the authenticity of the documents had been established, Grotrian failed to prove the elements necessary to invoke the doctrine of collateral estoppel with respect to the factual determinations therein.[10] See generally 1B Moore's Federal Practice ¶¶ 0.442[2], 0.443[1] (2d ed. 1974).[11]

The district court did not rule on the admissibility of the German decisions under Rule 44(a)(2). It held that they were irrelevant on the ground that decisions of foreign courts on the respective trademark rights of the parties have no application to litigation in an American court concerning trademark rights. 365 F.Supp. at 719 & nn. 60 and 61.

While it might be tempting to rule on the interesting issues raised concerning Rule 44(a)(2) and collateral estoppel, under our view of the case there is no need to reach those issues on this appeal. We believe, assuming that the German decisions were admissible and that they contain the factual determinations claimed by Grotrian, the district court's finding of malice is fully supported by the actions of Grotrian since 1926.

First, there is evidence which supports a finding that Grotrian has attempted to exploit the similarity between "Steinweg" and "Steinway" to enhance its

9. Steinway challenges the authenticity of the decisions not only for failure to comply with Rule 44(a)(2), but also because the notary who certified the authenticity of copies of the decisions had been a defendant in one of the suits which reached the German Supreme Court in 1926 and had represented Grotrian in litigation with Steinway in Germany between 1876 and 1926.

10. The principle of res judicata clearly is not applicable. The judgment of a German court in 1926 in a suit involving German trademark law can hardly be said to be conclusive in a suit concerning Lanham Act violations decades later in the United States.

11. Steinway's expert on German law, Dr. Wolfgang Mueller-Stofen, testified that, while German courts recognized the doctrine of res judicata, there is no doctrine of collateral estoppel in Germany. Cf. *Watkins* v. *Conway*, 385 U.S. 188, 190–91 (1966) (per curiam) (Full Faith and Credit Clause does not require forum to give more recognition to judgment than is given by the state which rendered it).

sales in this country. As the district court pointed out:

> "There is an obvious visual and audible similarity between 'Steinway' and 'Steinweg', which is enhanced when the German 'veg' is translated to the English 'way.' *The probability of audible identity of the marks is virtually assured by plaintiff's instructions to its dealers."* 365 F.Supp. at 715 (emphasis added).

Such finding is squarely supported by an advertising brochure published by Grotrian in which instructions were given to the English-speaking reader on how to pronounce "Grotrian-Steinweg":

> "The name should be pronounced as shown phonetically thus
>
> GRO–TREE–AN SHTYNE–VAKE:
>
> the final letter K being soft or voiceless."

Helmut Grotrian-Steinweg, a Grotrian partner, testified that his name is pronounced "Steinveg", apparently with a "g". But the instructions in Grotrian's brochure leads to a pronunciation suspiciously close to "Steinway". The instructions can hardly be said to be conducive to distinguishing between the two names. And if the correct pronunciation is as Helmut Grotrian-Steinweg testified, such instructions can only point to an intent to exploit the similarity to "Steinway", not to differentiate.

■ Second, evidence of Grotrian's exploitation of Steinway's trademarks is found in another advertising brochure published by Grotrian which had been in use for four or five years at the time of trial. In that brochure Grotrian promi-

nently referred to the "Grotrian-Steinweg" as "The Instrument of Immortals".[12] This was nothing less than a blatant copying of Steinway's registered slogan "Steinway—The Instrument of the Immortals." [13] Indeed, Helmut Grotrian-Steinweg testified that when he prepared the brochure he was aware of Steinway's slogan but did not realize that it was registered in the United States. His assertion that, had he known that the slogan was registered he would not have used it, patently was insufficient to justify the copying. Steinway's slogan is not a common term entitled to "fair use" by all, see *Venetianaire Corp. of America v. A&P Import Co.,* 429 F.2d 1079, 1081–82 (2 Cir. 1970); *B&L Sales Associates v. H. Daroff & Sons, Inc., supra,* 421 F.2d at 354; 15 U.S.C. § 1115(b)(4) (1970), but is entitled to the full protection of the trademark laws. Compare *Kiki Undies Corp. v. Alexander's Department Stores, Inc.,* 390 F.2d 604 (2 Cir. 1968).

■ We hold that the inference of malice is clear.[14] Grotrian, knowing of Steinway's slogan, brazenly adopted one identical to it. *Venetianaire Corp. of America v. A&P Import Co., supra,* 429 F.2d at 1083. Paraphrasing what we said more than two decades ago in a very similar situation:

> "Why it should have chosen a [slogan] that had long been employed by [Steinway] and had become known to the trade instead of adopting some other means to identify its goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [Steinway] had

---

12. The cover of another brochure referred to Grotrian's product as "The Immortal Grotrian-Steinweg Piano with the Homogeneous Soundingboard."

13. See note 5, *supra.*

14. Normally, the alleged infringer's intent is an issue for district court determination. *Miss Universe, Inc. v. Patricelli, supra,* 408 F.2d at 509. Such a finding with regard to the copying of the Steinway slogan, however, is not a prerequisite to our drawing an inference of malice here. Since the evidence on this issue

consists of a comparison of advertising copy, we are in as good a position as the district court to make the determination. *Blue Bell, Inc. v. Jaymar-Ruby, Inc.,* 497 F.2d 433, 435 & n. 2 (2 Cir. 1974); *Miss Universe, Inc. v. Patricelli, supra,* 408 F.2d at 509; *Miles Shoes, Inc. v. R. H. Macy & Co.,* 199 F.2d 602, 603 (2 cir. 1952), *cert. denied,* 345 U.S. 909 (1953); see *Fur Information and Fashion Council, Inc. v. E. F. Timme & Son, Inc.,* 501 F.2d 1048, 1050–51 (2 Cir.), *cert. denied,* 419 U.S. 1022 (1974).

built up . . . ." *Miles Shoes, Inc. v. R. H. Macy & Co., Inc.,* 199 F.2d 602, 603 (2 Cir. 1952), *cert. denied,* 345 U.S. 909 (1953).

Thus, assuming arguendo that the use of the Steinweg name by Grotrian and by the Grotrian-Steinweg family was judicially sanctioned in 1926, in Grotrian's more recent attempt to enter the American market it not only has exploited the similarity of its name to that of Steinway, but has gone so far as to copy Steinway's registered slogan. Such evidence demonstrates, at the very least, a deliberate intent to lead prospective purchasers to believe that there is some connection between Grotrian and Steinway and their products.[15]

■ We hold that the district court's finding of a deliberate intent to infringe is not clearly erroneous but is supported by substantial evidence.

(B) *Similarity of Marks, Actual Confusion, and Degree of Care*

■ We find it difficult in a trademark infringement case such as this to consider separately the issues of similarity of trademarks, actual confusion and degree of care likely to be exercised by a purchaser, since the products of the parties compete directly in terms of price, type of instrument and quality. We therefore shall consider those issues together here.[16]

■ In finding similarity of marks, the district court noted that the words "Steinway" and "Steinweg" look and sound alike. The similarity between the names "Grotrian-Steinweg" and "Steinway" is no less since the assumption that "Grotrian" is the first name and "Steinweg" the last is inevitable in the United States where hyphenated surnames are uncommon. 365 F.Supp. at 715. Moreover, the court found actual confusion on the basis of two surveys conducted by Steinway and the representation by an American Grotrian dealer to a Steinway dealer that the Grotrian-Steinweg was a German Steinway. 365 F.Supp. at 716. Finally, despite the high price range of both pianos ($5,000 to $13,000) and the general sophistication of purchasers, the court found that the degree of care exercised by buyers could not eliminate the confusion between a Steinway and a Grotrian-Steinweg piano. 365 F.Supp. at 716–17. We hold that the district court was not clearly erroneous in its findings on these factors.

We agree with Grotrian that in examining the actual trademarks for similarity of marks the district court failed to take into account the wholly different typefaces of the two marks. The Grotrian-Steinweg mark is in Old English type while that of Steinway is in Roman type. This difference serves to distinguish the marks visually. *Blue Bell, Inc.* v. *Jaymar-Ruby, Inc.,* 497 F.2d 433, 434–35 (2 Cir. 1974). And of course in Grotrian's mark the word Steinweg is preceded by

---

**15.** *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict,* 198 U.S. 118 (1905), and *J. R. Wood & Sons, Inc.* v. *Reese Jewelry ⌐crp.,* 278 F.2d 157 (2 Cir. 1960), cited by Grotrian, are inapposite. In those cases there was no deliberate intent to cause confusion. Indeed, in *Howe Scale,* the defendant manufacturer had advertised widely that his product, the Remington-Sholes Typewriter, "was not the Remington Standard Typewriter" manufactured by the complainant manufacturer and that the two companies had no connection whatsoever. 198 U.S. at 124, 139.

**16.** Grotrian contends that in reviewing the district court's findings on these issues we are not bound by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a) and that we need not give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses" since the evidence was documentary or undisputed. We disagree.

While we have exercised our prerogative in trademark infringement cases to make an independent judgment on the likelihood of confusion insofar as that determination rests on a comparison of the marks themselves, we also have held that the determination of actual confusion is one for the district court as the trier of the facts. *Blue Bell, Inc.* v. *Jaymar-Ruby, Inc., supra,* 497 F.2d at 435 & n. 2; *Miss Universe, Inc.* v. *Patricelli, supra,* 408 F.2d at 509. Moreover, Grotrian's arguments demonstrate that the issue of actual confusion in this case hardly arises from undisputed facts.

the word Grotrian.[17] Moreover, the corporate names of the parties, "Grotrian, Helfferich, Schulz. Th. Steinweg Nachf." and "Steinway and Sons", can hardly be said to be similar.

■ The examination of the similarity of the trademarks, however, does not end with a visual comparison of the marks. Trademarks, like small children, are not only seen but heard. Similarity of sound also enters into the calculation of likelihood of confusion. *LaTouraine Coffee Co.* v. *Lorraine Coffee Co.*, 157 F.2d 115, 117 (2 Cir.), *cert. denied*, 329 U.S. 771 (1946); accord, *David Sherman Corp.* v. *Heublein, Inc.*, 340 F.2d 377, 380 (8 Cir. 1965). The district court's finding that auditory confusion is inevitable and thus that similarity of marks exists is not clearly erroneous.

It is undisputed that the parties are in direct competition for a rather limited class of customer. Few people in the United States ever have heard of a Grotrian-Steinweg. Whatever reputation Grotrian's products may enjoy outside the United States and whatever may be the competition between the two pianos in other countries, Steinway is the renowned name here. We think it is inescapable that a potential American purchaser of the kind of piano which the parties sell, upon hearing the name "Grotrian-Steinweg", would associate Grotrian's product with Steinway. Further support for this is found in Grotrian's instructions on how to pronounce its mark, referred to above.

Turning to the issue of actual confusion, we hold that the court's finding that such confusion existed is not clearly erroneous but is supported by substantial evidence.

The dealer confusion incident relied on by the court occurred when a Steinway dealer was told by a Grotrian dealer that the Grotrian-Steinweg was a German Steinway. Grotrian argues that this was not an illustration of actual confusion.

We disagree. The Steinway dealer who testified to this incident also told of customer confusion engendered by the Grotrian dealer's persistent reference to his piano as "the original Steinway", or the "German Steinway", and to the word Steinway "as an Americanization of the word 'Steinweg.'" The same dealer once advertised Grotrian's piano as the "Grotrian-Stein*way*". (emphasis added). There also was evidence that other dealers invited association between the Steinway and the Grotrian-Steinweg in their advertisements. Even the telephone company mistakenly listed a Grotrian-Steinweg dealer under the heading "Steinway Pianos" in the San Francisco telephone directory. Finally, Helmut Grotrian-Steinweg admitted at trial that he had been called Mr. Steinweg in conversations and had been asked whether there was a connection between Grotrian and Steinway. Recognizing the general difficulty of finding evidence of actual confusion, we think such incidents highly persuasive in demonstrating the existence of confusion.

Grotrian also challenges the admission of two surveys commissioned by Steinway. Their purpose was to determine what consumer confusion existed with respect to the connection between Grotrian and Steinway. One, the Rittenhouse survey, was based on interviews with actual purchasers of Grotrian-Steinweg pianos. The other, the Crosley survey, consisted of a tabulation of associations between various makes of pianos obtained in on-the-street interviews with people who said they were interested in buying a piano in the next five years.

The court reserved decision on Grotrian's hearsay objection to the admissibility of the surveys at trial, but in its decision took them into consideration as evidence of actual confusion. 365 F.Supp. at 716. Its basis for admitting them was the necessity for evidence of actual confusion, coupled with the court's conviction of the surveys' trustworthiness. 365

---

**17.** We have some doubt whether potential buyers of these pianos, which the record indicates on the whole are highly educated, would fail to recognize a hyphenated name as a surname.

F.Supp. at 716 n. 32, citing *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 683 (S.D.N.Y.1963) (Feinberg, J.).

On appeal, Grotrian argues that it was error to have overruled its hearsay objection to the admission of the surveys and that, even if admissible, they were not entitled to the weight given them by the district court. We disagree.

■ There is substantial authority to support the admissibility of properly conducted surveys in trademark infringement cases, as well as other types of cases. E. g., *President and Trustees of Colby College v. Colby College—New Hampshire*, 508 F.2d 804, 809 (1 Cir. 1975); *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 447 (5 Cir. 1973); *Rosado v. Wyman*, 437 F.2d 619, 627–29 (2 Cir. 1970), *aff'd without opinion*, 402 U.S. 991 (1971); *Bank of Utah v. Commercial Security Bank*, 369 F.2d 19, 27 (10 Cir. 1966), *cert. denied*, 386 U.S. 1018 (1967); *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co.*, 349 F.2d 389, 395–96 (2 Cir. 1965), *cert. denied*, 383 U.S. 942 (1966). We are mindful of the on-going dispute as to whether a survey should be admissible as non-hearsay, under the state of mind exception to the hearsay rule or based on the need for it plus adequate guarantees of trustworthiness.[18] We hold that the district court did not err in admitting the surveys here in question.

■ The more relevant issue was the weight to be given to the surveys. See Advisory Committee's Note to Rule 703 of the Federal Rules of Evidence (effective July 1, 1975), 56 F.R.D. 183, 283 (1972). Grotrian was given ample opportunity both at trial and in post-trial memoranda to challenge the validity of the surveys.[19] The weight to be given to them was for the district court as the trier of the facts to determine. We cannot say that it erred in giving weight to the surveys as evidence of actual confusion.

Finally, the court found that, despite the high price of the pianos and the sophistication of the purchasers, the likelihood of confusion resulting from the factors discussed above could not be eliminated by the degree of care taken in selection:

"It is the subliminal confusion apparent in the record as to the relationship, past and present, between the corporate entities and the products that can transcend the competence of even the most sophisticated consumer.

Misled into an initial interest, a potential Steinway buyer may satisfy himself that the less expensive Grotrian-Steinweg is at least as good, if not better, than a Steinway. Deception and confusion thus work to appropriate defendant's good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company." 365 F.Supp. at 717 (footnote omitted).

Grotrian contends that in considering the issue of the degree of care exercised by purchasers the court failed to give sufficient weight to the nature of the products, their cost, and the conditions under which they are purchased. It argues that there was no proof, and inferentially in view of the above three fac-

---

**18.** See generally *Zippo Manufacturing Co. v. Rogers Imports, Inc., supra*, 216 F.Supp. at 682–83.

**19.** Marguerite L. Rittenhouse, who conducted the Rittenhouse survey, took the stand and was available for cross-examination. Transcripts of the Rittenhouse interviews were available to the district court. Grotrian submitted its own depositions by those who had been interviewed in the Rittenhouse survey in an effort to contradict those transcripts.

Franklin B. Leonard, who tabulated and summarized the Crosley survey, also took the stand and was subjected to cross-examination on his methodology and conclusions. His testimony was challenged by that of Marvin Baiman who denigrated the Crosley survey.

The evaluation of such competing testimony is the classic function of the trier of the facts.

tors that there could be no proof, that anyone ever had bought or would buy a Grotrian-Steinweg piano thinking it was a Steinway or was guaranteed by Steinway. Therefore, according to Grotrian, no infringement was shown.

■ We recognize that in a trademark infringement action the kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist. We decline to hold, however, that actual or potential confusion *at the time of purchase* necessarily must be demonstrated to establish trademark infringement under the circumstances of this case.

■ The issue here is not the possibility that a purchaser would buy a Grotrian-Steinweg thinking it was actually a Steinway or that Grotrian had some connection with Steinway and Sons. The harm to Steinway, rather, is the likelihood that a consumer, hearing the "Grotrian-Steinweg" name and thinking it had some connection with "Steinway", would consider it on that basis. The "Grotrian-Steinweg" name therefore would attract potential customers based on the reputation built up by Steinway in this country for many years. The harm to Steinway in short is the likelihood[20] that potential piano purchasers will think that there is some connection between the Grotrian-Steinweg and Steinway pianos. *HMH Publishing Co. v. Brincat,* 504 F.2d 713, 716 & n. 7 (9 Cir. 1974); *Triangle Publications, Inc. v. Rohrlich,* 167 F.2d 969, 973 (2 Cir. 1948), *overruled in part on other grounds, Monsanto Chemical Co. v.*

*Perfect Fit Products Manufacturing Co., supra,* 349 F.2d at 389 (overruling *Triangle* on question of availability of accounting); *Yale Electric Corp. v. Robertson,* 26 F.2d 972, 973–74 (2 Cir. 1928). Such initial confusion works an injury to Steinway.

We caution, however, that each trademark infringement case is to some extent *sui generis.*

> "[I]n the final analysis the decision must rest on the court's conviction as to possible confusion . . . ." *Miles Shoes, Inc. v. R. H. Macy & Co., supra,* 199 F.2d at 603.

In the instant case, Steinway's mark is strong and its name famous in the United States. On the other hand, Grotrian's mark is virtually unknown here. The products of the two manufacturers compete on a direct basis. Actual confusion has been demonstrated. An intent on the part of Grotrian to obtain a free ride in the United States on the strength of Steinway's name has been shown. Under these circumstances, despite the care exercised by purchasers in their selection of pianos, the court's finding of the likelihood of confusion is not clearly erroneous but is supported by substantial evidence.

■ We hold that the district court correctly concluded that Grotrian consciously and intentionally infringed Steinway's trademarks.[21]

### III.

Finally, we come to the relief granted by the district court. For the reasons below, we modify the judgment in part.

---

20. A mere possibility would not be enough. *HMH Publishing Co. v. Brincat,* 504 F.2d 713, 717 (9 Cir. 1974).

21. Steinway's unfair competition claim is governed by essentially the same considerations as its infringement claim. *Menendez v. Saks and Co.,* 485 F.2d 1355, 1375 n. 22 (2 Cir. 1973), *cert. granted on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 416 U.S. 981 (1974); *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 614 (2 Cir.), *cert. denied,* 364 U.S. 909 (1960). We hold, for

substantially the reasons set forth above with respect to the trademark infringement claim, that the district court correctly concluded that Grotrian had engaged in unfair competition with Steinway. 365 F.Supp. at 720–21.

Our holdings above also dispose of Grotrian's claims for a declaration of non-infringement, for unfair competition and for tortious interference with its contractual relations with Wurlitzer. We hold that the district court correctly rejected those claims. 365 F.Supp. at 720–21.

Having found trademark infringement, the court included in its judgment pursuant to 15 U.S.C. § 1116 (1970) essentially the following relief. Grotrian was enjoined from infringing Steinway's trademarks, from creating a likelihood of injury to Steinway's business reputation and from causing a likelihood of dilution or misappropriation of Steinway's goodwill. This included an injunction against using in the United States the name "Steinweg" or any other colorable imitation of any of Steinway's trademarks in Grotrian's marks or corporate name. Grotrian was enjoined from making any reference to the historical connection between the firms. Grotrian was further enjoined from prosecuting in the United States any application for registration of a trademark which included the name "Steinweg". The judgment also provided for damages to Steinway resulting from Grotrian's acts in the United States since 1952 in violation of Steinway's trademark rights and from Grotrian's acts of unfair competition since 1952. The judgment also awarded to Steinway Grotrian's profits from its sales of pianos in the United States since 1952. Finally, a special master was appointed to take an accounting to determine these profits and damages.

Grotrian argues on appeal, as it did below, that Steinway is barred by laches from obtaining any relief whatsoever in view of what Grotrian asserts was Steinway's forty year delay following the peace cigar settlement of 1929 in asserting its rights against Grotrian in the United States.

The district court held that, since the peace cigar settlement included a relinquishment by Grotrian of any claim to the United States market, there could be no laches between 1929 and 1952 when Grotrian reentered the United States market. It found, however, that the evidence on delay appeared to weigh in Grotrian's favor since two letters indicated that Steinway knew of Grotrian's reentry into the United States from at least 1957. It nevertheless held that Grotrian's defense of laches had not been established because no prejudice had been proven. Grotrian did not show any advertising or promotion in the United States market, nor did it demonstrate any expansion in production or distribution facilities in reliance on its entry into the United States market. It did not sustain any injury to its goodwill because public awareness of its mark was minimal. 365 F.Supp. at 717–19. The court held that Grotrian's reliance on a defense of laches was further weakened by its "conscious imitation and attempted exploitation of Steinway's mark." 365 F.Supp. at 719 (footnote omitted).

Grotrian contends that the court's findings with respect to the meaning of the peace cigar settlement and Grotrian's lack of expenditures on advertising or promotion in the United States were clearly erroneous. We disagree.

■ As to the meaning of the peace cigar settlement, Grotrian's withdrawal from the United States market from the time of that meeting in 1929 until 1952 supports the court's inference that Steinway's version of the peace cigar settlement was the correct one. There was no proof of the terms of the settlement. Grotrian contends that the settlement indicated Steinway's acceptance of the use of the "Steinweg" and "Grotrian-Steinweg" trade names in the United States. It explains the dwindling of its American activities as due to the depression and subsequent war with Germany. The court found, however, that the dwindling activities pointed to the opposite inference—that Grotrian had agreed to cease using the trade names in the United States.

■ We hold that the district court's finding of lack of prejudice to Grotrian from Steinway's delay since 1957 in asserting its rights is not clearly erroneous. Indeed, Grotrian has pointed to no evidence in the record to the contrary.[22]

---

**22.** Advertising by Grotrian itself in the United States consisted only of distribution of catalogues and brochures to its dealers. Although its dealers did advertise here, they were not required to do so. Despite the fact that Grotrian's sales here rose from $18,000 in 1952 to a

After careful consideration of Grotrian's objections to the injunction we are not persuaded that the district court abused its discretion in rejecting Grotrian's defense of laches in view of Grotrian's deliberate attempt to trade on Steinway's reputation in the United States. *Baker* v. *Simmons Company,* 307 F.2d 458, 466 n. 4 (1 Cir. 1962); *My-T Fine Corp.* v. *Samuels,* 69 F.2d 76, 78 (2 Cir. 1934). We affirm the injunctive relief granted by the district court.

An award of damages and profits is also subject to principles of equity. *Carl Zeiss Stiftung* v. *Veb Carl Zeiss Jena,* 433 F.2d 686, 706 (2 Cir. 1970), *cert. denied,* 403 U.S. 905 (1971); 15 U.S.C. § 1117 (1970), note 7, *supra.* A monetary award for past infringement, however, is not an automatic concomitant of the grant of injunctive relief against future infringement. *H. A. Metz Laboratories, Inc.* v. *American Pharmaceutical Co.,* 18 F.Supp. 598, 600 (S.D.N.Y.1936), *aff'd sub nom. Winthrop Chemical Co.* v. *American Pharmaceutical Co.,* 94 F.2d 587 (2 Cir. 1938).

Steinway learned of Grotrian's sales of pianos in this country as early as 1957. It did nothing until the Wurlitzer agreement was announced in 1967. Under such circumstances there was an abandonment of any claim for monetary relief, notwithstanding Grotrian's deliberate infringement. *Hanover Star Milling Co.* v. *Metcalf,* 240 U.S. 403, 419 (1916); *Menendez* v. *Holt,* 128 U.S. 514, 523 (1888); *McLean* v. *Fleming,* 96 U.S. 245 (1877); *San Francisco Ass'n for the Blind* v. *Industrial Aid for the Blind, Inc.,* 152 F.2d 532, 537 (8 Cir. 1946). We hold that the district court erred in granting an award of damages and profits to Steinway and we vacate that portion of the judgment.

Accordingly, the judgment of the district court is modified by deleting paragraph 7, except for the provision as to costs, and so much of paragraph 8 as

high of $100,000 in 1970, this only accounted for a corresponding rise from 16 to 48 in actual unit sales per year. Moreover, Grotrian's

relates to an accounting for damages and profits. As so modified, the judgment is affirmed.

No costs on appeal.

production capacity at the time this action was commenced was less than it was in 1927.