**EXXON CORPORATION, Plaintiff,**

v.

**XOIL ENERGY RESOURCES, INC.,
et al., Defendants.**

No. 80 Civ. 3347 (VLB).

United States District Court,
S.D. New York.

April 7, 1981.

Weiss, Dawid, Fross, Zelnick & Lehrman, New York City, for plaintiff.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This is an action for trademark infringement and unfair competition. I have jurisdiction pursuant to Title 15 U.S.C. § 1121 and Title 28 U.S.C. § 1338(a) and (b).

EXXON Corporation is a New Jersey corporation with headquarters in New York City.[1] It is one of the world's larger business enterprises, engaged in virtually every aspect of the oil and gas business, from exploratory and developmental well drilling to refining and retail marketing. In the course of its business activities it enters into oil and gas. land leases and partnerships, and it markets securities to finance these and other operations.

In 1972 plaintiff adopted the trade name "EXXON", a coined term first registered as a trademark in 1968. Plaintiff subsequently spent $70 million advertising that trade name in conjunction with its overall corporate activities, in particular with its consumer gasoline sales and automobile service stations. Its success has been such that the term "Exxon" has become literally a household word.

Plaintiff's other trademark relevant to this suit is "Oilex", a mark first registered in 1923 and used by some unspecified fraction of the plaintiff's service stations in connection with the marketing of a low grade lubricant manufactured by the plaintiff.

Defendants are XOIL Energy Resources, Inc. ("XOIL"), a corporation organized in 1977 in the State of Delaware and having its principal place of business in New York City, and various related entities and individuals: two of its four subsidiaries, five partnerships and one joint venture formed by the parent company; a company that has sold interests and securities in the partnerships; and several principals of these entities. Defendants are in the business of providing interests in tax shelters related to exploratory and developmental oil and gas well drilling.

Defendants do not offer retail products to the consuming public. They have not registered the name "XOIL" as a trademark, and have no intention of doing so.

The amended complaint includes four claims:

1) a claim under Title 15 U.S.C. § 1114(1) that defendants have infringed plaintiff's registered trademarks "EXXON" and "OILEX" by using the name "XOIL";

2) a claim under Title 15 U.S.C. § 1125(a) of false designation of origin and false representation;

3) a claim of common law unfair competition, in that the use by defendants of the names XOIL and XPLOR suggests a connection between defendants' business and that of plaintiff; and

4) a claim under New York General Business Law § 368-d that the use by defendants of the names XOIL and XPLOR dilutes the marks EXXON and OILEX.

Defendants have moved to dismiss the amended complaint. Because I have considered matters outside the pleadings, this

---

1. Exxon Corporation was formerly known as Standard Oil Company (New Jersey).

has been treated as a motion for summary judgment.

Plaintiff has moved preliminarily to enjoin defendants from using the term "XOIL" or any similar term during the pendency of this action, except for "uses associated with or necessary to the continued conduct of the business actually engaged in prior to the date of" the injunction.

For the reasons which follow, both motions are denied.

## II.

■ The existence of genuine issues of material fact requires denial of defendants' motion for summary judgment. These issues pertain, *inter alia,* to

1) defendants' intent in selecting the name "XOIL Energy Resources, Inc.";

2) whether, as of the time this action was brought, defendant XOIL had developed goodwill related to its name;

3) whether, to what extent, and in what contexts, plaintiff and defendant XOIL compete;

4) whether, if plaintiff and defendant XOIL do not presently compete, it is likely that defendant XOIL will become active in areas in which it is not presently involved and in which it will be in competition with plaintiff, or that plaintiff will become active in areas in which it is not presently involved and will compete in such areas with defendant XOIL; and

5) whether there is actual confusion in any segments of the public between plaintiff and plaintiff's marks ("Exxon" and "Oilex") on the one hand, and defendant XOIL on the other.[2]

## III.

■ Plaintiff concedes that it first learned of the existence of a company using "XOIL" as part of its name through a pub-

2. When trial is had in this matter, the following facts shall be deemed established, pursuant to Rule 56(d), Fed.R.Civ.P.:

On July 1, 1980 defendant XOIL filed with the SEC a registration statement on form S–1 in connection with a public offering of 600,000 shares of its common stock. The registration statement made express mention of the commencement and pendency of this action and of the claims alleged in the complaint.

On August 14, 1980, defendant XOIL filed with the SEC an amendment to its registration statement which, among other things, made express mention of the claims alleged in the amended complaint.

On August 26, 1980, defendant XOIL filed with the SEC a second amendment to its registration statement which, among other things, made express mention of the filing by plaintiff of its motion for a preliminary injunction and the nature of the relief sought therein.

Guideline 54 promulgated by the SEC in connection with the preparation and examination of registration statements under the Securities Act of 1933 provides in part as follows:

A registrant's name may also be misleading if it is the same or substantially the same as the name of another well-known company. If it appears likely that the registrant's name may be confused with the name of the other company, consideration should be given to changing the name.

The 600,000 shares of common stock of defendant XOIL are being traded in the over-the-

counter market under the trading symbol "XOIL".

Pursuant to a registration statement declared effective by the SEC in October of 1979, 6,400,000 shares of the common stock of Xplor Energy Corporation were sold to the public and are being traded in the over-the-counter market under the trading symbol Xplr.

The common stock of plaintiff is traded on the New York Stock Exchange (and others) under the trading symbol XON.

The common stock of the companies listed below is traded under the following trading symbols on the following markets:

| Company | Exchange | Symbol |
|---|---|---|
| Excel Energy | Over-the-Counter | EXLL |
| Exolon Co. | Boston | EXL |
| Exxon Corp. | New York, Boston, Cincinnati, Midwest Philadelphia | XON |
| XOMOX CORP. | Over-the-Counter | XOMX |
| XONICS, Inc. | Philadelphia, American | XOX |
| Xtra Corp. | New York, Boston | XTR |

Plaintiff does not raise capital for drilling operations through the sale of limited partnership interests either privately or to the public.

According to the records of the SEC, the last registration statement filed by plaintiff for the public issuance of any type of its own securities was filed on January 29, 1970.

Plaintiff does not, for the most part, negotiate for oil and gas leases with individual landowners under its own name.

lic advertisement on some unspecified date in July, 1979.[3]

The complaint was filed almost a year later, on June 13, 1980. While the complaint included a prayer for injunctive relief the motion for a preliminary injunction was not filed until two months later, on August 19, 1980. This motion was made almost a month after the defendants had moved to dismiss the complaint and more than a month after defendants had filed with the SEC to register a public offering of XOIL's common stock.

In its amended complaint plaintiff seeks, *inter alia,* permanently to enjoin the use by defendants of the name "XPLOR". In October, 1979, sometime after plaintiff concedes it learned of defendants and their activities, a public offering was made of stock in Xplor Energy Corporation. Plaintiff took no action.

Whatever effect plaintiff's dilatoriness may or may not have with respect to its plenary claims against defendants—and I make no judgment with respect to that at the present time—that dilatoriness is fatal to plaintiff's application for preliminary injunctive relief:

> Delay of this nature [ten months from time plaintiff became aware of infringing product line until suit was brought] undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.

*Le Sportsac, Inc. v. Dockside Research, Inc.,* 478 F.Supp. 602, 609 (S.D.N.Y.1979).

## IV.

While the application for a preliminary injunction has been denied on the basis set forth in Section III, *supra,* I have considered the merits of the application, and would have denied it for the reasons set forth below even if there had been no question of laches. I stress, however, that the following discussion is predicated only upon the facts submitted in connection with the applications for summary judgment and for a preliminary injunction. Those facts were by their nature sketchy: neither party has yet had full discovery. At a plenary trial, when all the facts have been developed, the factual pattern will certainly be more complete. Any findings contained below are, therefore, made only for the purpose of consideration of the application for preliminary injunction, and are not to be considered conclusive.

The standards for a preliminary injunction in this Circuit have been restated in *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755 (2d Cir.1979):

> Preliminary injunctive relief in this Circuit calls for a showing of
>
> "(a) irreparable harm and
>
> (b) either
>
> (1) likelihood of success on the merits or
>
> (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Id.* at 758[4] (emphasis added).

Plaintiff claims that defendants' use of the name XOIL in connection with oil and gas (or energy) enterprises, will cause irreparable harm because it will be likely to cause the public to confuse the name XOIL with EXXON. The possible consequences

---

**3.** One Exxon officer, Mr. Hal Rosen, may have learned of the name and business of XOIL as long ago as early 1978 during a conversation with defendant Eric Goldman at a private party.

**4.** Plaintiff's suggestion of the standard for a preliminary injunction in this circuit includes the element of *"possible* irreparable injury" (emphasis added), which would water down the standard which the Second Circuit has in fact enunciated. The court in *Jack Kahn, su-* pra, vacated the lower court injunction, in part because plaintiff there "wholly failed to meet its burden of proving the requisite *probability* of irreparable injury ..." *Jack Kahn, supra,* 604 F.2d at 759 (emphasis added). The court stressed that "irreparable harm" is "not remote or speculative but ... actual and imminent." *Jack Kahn, supra,* 604 F.2d at 759, *quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

to plaintiff from such confusion which plaintiff foresees are loss of good will, increased prices to plaintiff for oil and gas leases in those geographic areas where the parties compete for such leases, and impairment of plaintiff's ability to raise funds for oil and gas exploration.[5]

Thus plaintiff equates "irreparable harm" with the "likelihood of confusion" in the context of this case. In a trademark case the likelihood that the plaintiff will be successful on the merits is in normal course also directly correlated to the likelihood of confusion. I turn, therefore, to a consideration of whether there is a likelihood of confusion between defendants' name "XOIL" and plaintiff's marks "EXXON" and "Oilex".

[3] The most important test for determining whether plaintiff's trademark has been infringed is whether defendants' name so resembles plaintiff's mark that its use is likely to cause confusion or entail mistake or deception as to the source or origin of defendants' services or product. *See* 15 U.S.C. §§ 1114, 1125 and 1127. In the context of this case, will the use by the defendants of the name "XOIL" cause the public to believe that there is some relationship or association between plaintiff Exxon and defendants' various entities?

■ There are, of course, various criteria which come into play in determining whether there has been an infringement of an established mark by another mark. These include the strength of the plaintiff's mark; the degree of similarity between the plaintiff's mark and the mark complained of; the proximity of the products marketed under both marks; the likelihood that the prior owner will market products in the future similar to those marketed under the challenged mark; and whether there has been actual confusion. Other criteria are the defendants' good faith in adopting the challenged mark; the quality of the products marketed under the challenged mark;

and the extent to which customers are knowledgeable and informed. One important criterion requires consideration of the harm which might be caused to the owner of the challenged mark by a finding of infringement or by an injunction against use, compared to the benefit which would be derived by the owner of the challenging mark from such action:

> [C]riteria useful in assessing a prior owner's claim that a non-competitor's use of a mark constitutes an infringement [include]: . . . "the strength of his [the prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers" and . . . "the serious harm an injunction would cause the defendant as against the benefit to plaintiffs," . . . *Polaroid Corporation v. Polarad Electronics Corp.,* 287 F.2d 492, 128 USPQ 411 (2d Cir.1961), *cert. denied,* 368 U.S. 820 [82 S.Ct. 36, 7 L.Ed.2d 25] (1961), as interpreted and expanded in *King Research, Inc. v. Shulton, Inc.,* 454 F.2d 66, 68, 172 USPQ 321, 322–323 (2d Cir.1972). *See also Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 162 USPQ 67 (2d Cir.1969), *cert. dismissed,* 396 U.S. 1054 [90 S.Ct. 707, 24 L.Ed.2d 698] (1970).

1. *Strength of plaintiff's marks.*

■ The "strength" of a mark pertains to its distinctiveness; to the ease with which it identifies a product as emanating from a particular source.

> The term "strength" as applied to trademarks refers to the distinctiveness sof the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.

---

**5.** Plaintiff alleges this harm would be irreparable, according to plaintiff, because of the virtual impossibility of calculating money damages in these areas. Plaintiff seeks preliminary re-

lief because it is even more difficult to calculate such damages retrospectively, should it subsequently be determined that the plaintiff's claims are valid.

*McGregor-Doniger Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979).

To the extent that a mark is strong, its validity as a trademark and its right to protection from infringement is more readily established:

> The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.

*Id.* at 1131.

The determination of the strength of a mark is not an exact science. It consists of searching out the presence or absence of certain characteristics or qualities of the mark with reference to the particular product to which it has been applied. Some of these characteristics or qualities connote, or are consistent with, weakness, and others suggest strength. Arbitrariness or fancifulness suggests strength. Generic terms— terms that refer, or have "come to be understood as referring to the genus of which the particular product is a specific" (*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976))—connote weakness, and a generic term is not entitled to legal protection. A descriptive term is also deemed to be weak, and is only protected if it has acquired a secondary meaning:

> A generic term can never become a valid trademark and cannot be registered. A descriptive term can be registered as a mark only if it has "become distinctive of the applicant's goods in commerce," 15 U.S.C. § 1052(f), that is, in the unfortunate parlance of the cases, only if it has acquired "secondary meaning." Suggestive marks, falling between the merely descriptive and the arbitrary or fanciful, are entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms.

*McGregor-Doniger Inc. v. Drizzle, Inc., supra* at 1131.

■ Plaintiff's mark "Exxon", which contains no generic, descriptive or suggestive elements, is an arbitrary or fanciful mark. It is a strong mark. It is entitled to the widest protection possible.

■ "Oilex" cannot be categorized quite so easily. It is, to be sure, a coined name— "oilex" is neither found in the dictionary nor used in common parlance. However, since the term does include the word "oil" and the product sold under that name is oil, the term is, to some considerable extent, descriptive. Is it also suggestive? I find that it is, since the application of some "imagination, thought and perception" is required for a person seeing or hearing the term to draw a conclusion as to the nature of the goods to which it has been made applicable by plaintiff:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), quoted with approval in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir.1976). The Patent Office registered the "Oilex" mark without requiring proof of secondary meaning. This affords a rebuttable presumption that the mark is suggestive rather than merely descriptive. *McGregor-Doniger, supra* at 1132.

■ While proof of secondary meaning is not always necessary where a mark constitutes a suggestive term, plaintiff does have the obligation of establishing the likelihood of confusion from the use by defendants of a similar mark, particularly if defendants use the similar mark on non-competing goods:

> As a suggestive term, the ... mark would be entitled to protection, regardless of proof of secondary meaning, *if* McGregor could prove that confusion of origin was likely to result from the use of a similar mark on non-competing goods. To the extent the district court held proof of secondary meaning *necessary,* it was in error. However, it was *not* error for the court to consider evidence bearing on the

strength of the mark in determining the likelihood of consumer confusion and thus the scope of protection to which the . . . mark was entitled.

*McGregor, supra* at 1132–3 (emphasis in original).

Determination of whether there has or has not been a secondary meaning developed for the mark "Oilex" will, in the context of this case, be helpful. There are very real similarities between defendants' names and plaintiff's "Oilex" mark, and it will therefore be helpful to determine as precisely as possible the true strength of plaintiff's "Oilex" mark:

> Proof of secondary meaning, acquired perhaps through successful advertising, can only enhance the strength of its mark and thus enlarge the scope of the protection to which it is entitled.

*McGregor-Doniger, supra* at 1132.

Despite extensive advertising of the "Exxon" mark, there has apparently been no advertising whatsoever for "Oilex" as a term for the plaintiff's product. In fact plaintiff evidently tries to distance the mark "Oilex" and the products sold under that term from its other products,[6] presumably reflecting a policy decision by plaintiff to market its higher quality products under its widely known and advertised mark and to sell "economy" or low-grade products under a readily distinguishable and less well-known label.[7]

■ On the record before me I find that the mark "Oilex" has only moderate strength. The scope of protection to which the mark is entitled is correspondingly smaller than that which is associated with the mark "Exxon".

■ The symbol "XON" is used in the securities markets to identify securities of the plaintiff. Plaintiff did not create this symbol, nor has it registered or promoted this symbol as a trademark. No products other than securities are identified by this symbol. Nor has any evidence been introduced that plaintiff itself uses this mark on securities when it sells them. Thus unlike the trademarks involved in this case, the symbol "XON" is not owned by, used to sell products by, or even created by plaintiff. Furthermore, while the symbol "XON" has a well-established secondary meaning in the investment community, it has no significance outside that community, the size of which must be considered small in relation to the general population. I find the strength of the symbol "XON" to be quite strong in the investment community but so small as to be insignificant in the general population.

2. *Degree of similarity between plaintiff's marks and defendants' marks.*

It has been stated that there are sufficient intangibles in any trademark infringement case that to some extent each one is *sui generis.*[8] The degree of similarity, or lack thereof, between two marks is surely one of those intangibles contributing to the difficulty of establishing a precise rule of law in this area.

Nevertheless, while precise rules may not be available, there are certain guiding principles which offer some help.

■ One such principle is that "[s]imilarity in and of itself is not the acid test.

---

**6.** An affidavit submitted by plaintiff of John Thompson of Exxon's Petroleum Products Department, dated August 11, 1980, states that "Exxon is the owner of the federally registered trademark Oilex, used on a low-priced and economy grade automotive lubricating oil sold nationally . . ." Thompson's affidavit suggests that Oilex is not sold at all Exxon service stations, but does not indicate what fraction of the total do carry the product.

**7.** Plaintiff's own recognition (or recollection) of the mark "Oilex" is evidently weak. Plaintiff has not introduced any evidence that a claim

for infringement of the mark "Oilex" was raised in the preliminary notice plaintiff gave defendants. The complaint filed in June, 1980 did not include any claims regarding the mark "Oilex". Those claims came nearly a month later when the amended complaint was filed.

**8.** *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975), citing *Miles Shoes, Inc. v. R.H. Macy & Co.,* 199 F.2d 602 (2d Cir.1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953).

Whether the similarity is likely to provoke confusion is the crucial question." 3 R. Callman, *Unfair Competition Trademarks and Monopolies* § 82.1(a), (3d ed. 1968) at 601–02 (footnote omitted). And "even close similarity between two marks is not dispositive of the issue of likelihood of confusion." *McGregor, supra* at 1133.

 Another such principle has application to the overall issue of likelihood of confusion, but is also directly relevant to the factor of degree of similarity. It is that the degree of similarity is not to be considered in a vacuum, but rather from the viewpoint of prospective purchasers. *See McGregor, supra* at 1133.

 A third principle is that the test of degree of similarity is one of overall impression upon the consumer: it does not require an element-by-element comparison:

> The law does not require that trademarks be carefully analyzed and dissected by the purchasing public. "[I]t is sufficient if the *impression* which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark."

*McGregor, supra* at 1134, quoting *Stix Products, supra*, 295 F.Supp. at 494 (footnote omitted; emphasis added). *See American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 107 (2d Cir. 1978).

Giving full consideration to those guiding principles, it is still necessary to consider the individual components of plaintiff's marks and defendants' names as a predicate to identifying the similarities or differences which may lead to confusion or lack of confusion. The marks follow:

| Plaintiff's Marks | Defendants' Names | Securities Markets Symbols |
|---|---|---|
| Exxon | XOIL Energy Resources, Inc. | XON (for plaintiff's securities) |
| Oilex | Xplor Energy Corporation | XOIL and XPLR (for defendants' securities) |

a) The first and most obvious point to be noted is that the names XOIL Energy Resources, Inc. and Xplor Energy Corporation are full company names rather than company trademarks or trade names.[9] This has been held to have a bearing on the issue of infringement.

> The fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion. *Warner Brothers Co. v. Jantzen, Inc.*, 249 F.2d 353, 354 (2d Cir.1957).

*McGregor, supra* at 1134.

 I find that the words "XOIL" and "Xplor" are generally used by defendants only as part of the full names of the corporations in which they appear. "Exxon", on the other hand, appears not only in the name of the plaintiff corporation, but is widely used standing alone as a logo on plaintiff's products and installations. "Oilex" is used by plaintiff as a logo on particular products.

b) The typefaces used in "XOIL" and "Xplor" when appearing in some use other than in the text of one of the offering documents of the defendants are different from those used in the marks "Exxon" and "Oilex" when those marks are used in their registered forms. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1339 (2d Cir.1975).

c) XOIL and Xplor both begin with an "X". Neither of the plaintiff's registered marks begins with an "X".

d) Defendants' names contain only one "X". Plaintiff's mark "Exxon" contains two "X's", which is perhaps the single most distinctive feature about this mark. However, even a mark beginning with the letters "Exx-", where the "X's" used were extended, as is the case with the registered Exxon logo, has been held not to infringe the "Exxon" mark when used on non-competitive products. *Exxon Corp. v. National Foodline Corp.*, 579 F.2d 1244 (C.C.P.A.1978) ("EXXELLO", used on ice cream making

**9.** Defendants have not sought to register as trademarks their corporate names or any parts thereof.

machines costing $3,500–$11,000, does not infringe "Exxon").

e) Both "XOIL" and "Oilex" use the word "oil" as part of the name, but "oil" is a generic term and cannot be given trademark protection by itself. Both terms are descriptive or suggestive in that they give the viewer some indication that the products or services involved in some fashion relate to oil products or the oil business.

f) "Oilex" has an "e" which is not found in XOIL.

g) "XOIL" is generally fully capitalized whereas Oilex is generally not capitalized.

h) Plaintiff's "Oilex" mark has been used only on plaintiff's low grade lubrication products.[10]

i) The name "Xplor" is obviously a transliteration of the word "explore" and does not share its major component, "plor", with any of the other marks or names involved in this case.

j) The symbol "XON" is used by the various stock exchanges where Exxon securities are traded as a ticker symbol to designate those securities.[11] Plaintiff contends that "XON" has come to identify goods (viz., stock and other securities) sold by, sponsored by or originating with the plaintiff, and is entitled to protection from marks or designations which are confusingly similar. Plaintiff also argues that defendants' securities are traded in the over-the-counter market, and that the symbols for defendants' securities, "XOIL" and "XPLR", will be confused with Exxon's ticker symbol "XON". In the absence of any evidence that the symbol "XON" is known at all outside of that small segment of the public which consists of the employees of stock exchanges, investment brokerage firms and their customers, and investment advisors

and their advisees, I continue my examination of the degree of similarity of the ticker symbols "XON", "XOIL", and "XPLR" to their usage in the stock business.

I note firstly that plaintiff's securities are traded on listed exchanges, whereas defendants' securities are traded in the over-the-counter market.

The securities of at least six companies (other than plaintiff or defendants) traded on various exchanges or in the over-the-counter market are designated by symbols involving the letter "X". At least one of these companies is engaged in the oil business:

| Company Name | Exchanges on Which Traded | Ticker Symbol |
|---|---|---|
| Excel Energy | Over-the-Counter | EXLL |
| Ex-Cello-Corp. | New York, Boston | XLO |
| Exolon Co. | Boston | EXL |
| XOMOX Corp. | Over-the-Counter | XOMX |
| XONICS, INC. | Philadelphia, American | XOX |
| Xtra Corp. | New York, Boston | XTR |

For those who recognize and use such symbols, the addition, deletion or change of a single letter is obviously more than sufficient to enable those active in the securities field to differentiate between the various symbols. I also note that most of the symbols cannot be pronounced easily, and infer that they are used primarily in written communications, or are spelled out whenever spoken. Obviously these two forms of usage would tend to reduce the likelihood of confusion stemming from visual similarity.

k) "XPLOR" and "XOIL" are much more similar to plaintiff's marks aurally than visually. "Exxon", "XOIL", and "Xplor" all commence with an "X" or "ex" sound: "X" and "ex" are phonetically indistinguishable. "XOIL" and "Oilex" share the same root, "oil", which sounds the same in both names.

---

**10.** In the plaintiff's only submitted example of the trade dress of those products (which I presume is representative) the mark appears on a round can, once on the front and once on the back. In both instances the mark appears as "oilex MOTOR OIL" with the "oilex" appearing in lower case letters but in type larger than that used in "MOTOR OIL", and the words "MOTOR OIL" appearing in capitals. Where the mark appears on the back, the mark is approxi-

mately 3¾ inches above the words "EXXON COMPANY, U.S.A." and "A DIVISION OF EXXON CORPORATION". When viewed from the back, the size, coloring and location of these marks are sufficient to make it readily identifiable as an Exxon product.

**11.** In stock tables presented to the general public through newspapers, plaintiff's securities are identified not by "XON" but by "Exxon".

"Xplor" has little in common with "Oilex" save for the "X" sound; the words "Oilex" and "Xplor" are readily distinguishable aurally. "Exxon" and "Xplor" are also easily distinguishable when heard. While there is a degree of aural similarity between "XOIL" on the one hand, and "Exxon" and "Oilex" on the other, the nature of defendants' business is such that every transaction involves, at some point, a written instrument. There could not be, under such circumstances, such reliance on the sounding of the name "XOIL" as to make aural similarity an important factor.

1) There are other factors which, while not controlling, may be entitled to some consideration.

i) The Securities and Exchange Commission ("SEC") is charged with the responsibility of determining whether any newly proposed stock bears a name similar to any other stock already registered.[12] I deem it significant that XOIL Energy Resources, Inc. stock was registered on the basis of prospectuses and other papers which made explicit reference to this lawsuit by Exxon charging trademark infringement.

ii) I deem it also significant that the appropriate state officials in New York and Delaware, states in which plaintiff Exxon is qualified to do business, considered whether defendants' proposed corporate names were confusingly similar to other corporate names, and did not on this ground reject "XOIL".[13]

iii) Various marks have been registered for trademark purposes which seem as close or closer to plaintiff's trademarks than do the names of defendants. Thus "Exoil" was registered in 1956 (for use in connection with skin treatment preparations); and "XerOil" was registered in 1963 (pertaining to powdered or pellet synthetic cutting fluid concentrate for general machining applications). "Exxon" itself was registered by plaintiff in 1968 (for petroleum products and lubricants generally, and for use in connection with skin treatment preparations). Plaintiff's trademark "Oilex" was already in existence when "Exoil" and "XerOil" were registered. Granted that "Exoil" and "XerOil" were issued for use on products that differed from those of plaintiff, " '[t]he greater the number of identical or more or less similar trade-marks already in use on different kinds of goods, the less is the likelihood of confusion . . .' Restatement of Torts § 729, Comment g (1938)." *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 504 (5th Cir. 1980).

I find that the names "XOIL" and "Xplor" are not very similar to the mark

---

**12.** Guide 54, as adopted by the Securities and Exchange Commission, reads as follows:

> 54. Misleading Character of Certain Registrants' Names
>
> A registrant's name may be materially misleading if it indicates a line of business in which the registrant is not engaged or is engaged only to a limited extent. If the registrant is not engaged to any substantial extent in the business indicated by the name, a change of name may be the only way to cure its misleading character. If the registrant is substantially engaged in the line of business, even though it does not comprise the major portion of the business, it may be sufficient to disclose under the name of the registrant on the cover page of the prospectus the limited extent to which the registrant is engaged in the business indicated by its name. This paragraph does not apply, however, to an established company which over a period of years has changed the general character of its business and where the investing public is

> generally aware of the change and the character of the registrant's present business.
>
> A registrant's name may also be misleading if it is the same or substantially the same as the name of another well-known company. If it appears likely that the registrant's name may be confused with the name of the other company, consideration should be given to changing the name. However, if both companies are new or small and relatively unknown and are located in different parts of the country, so that investors are not likely to mistake one company for the other, it would be sufficient to disclose on the cover page of the prospectus, under the name of the registrant, the lack of any relationship between the two companies.

Securities Act of 1933, Release No. 5005, issued September 17, 1969, 34 Fed.Reg. 15245, 17 C.F.R. 231.5005.

**13.** Delaware did reject one proposed name ("EXDEL"), presumably because it was confusingly similar to an existing corporate name.

"Exxon": there are more decided similarities between "XOIL" and "Oilex".[14]

As to the ticker symbol "XON", the relevant public is accustomed to distinguishing ticker symbols one from another. In the context of the securities market and those who are active in that market, there are not such similarities between the symbol for plaintiff's securities ("XON") and the symbols for those of defendants ("XOIL" and "XPLR") as to lead to any confusion. Nor does plaintiff have, in my judgment, any exclusionary rights with respect to the symbol "XON". *See Continental Corrugated Container Corp. v. Continental Group, Inc.*, 462 F.Supp. 200, 204 (S.D.N.Y.1978) ("It is doubtful ... whether a manufacturer can claim protection for an abbreviation of a trademark that it has never formally used.").

3. *Proximity of the Products.*

■ The defendants' business consists primarily of the sale of tax shelters in the form of limited partnerships in oil and gas drilling ventures. As ancillary businesses, the defendants have also formed subsidiaries engaged in the leasing of lands thought to bear oil and gas deposits, the sale of oil and gas-related limited partnership interests, and energy research. The parent company and a subsidiary have issued stock to the public, and one or both have sought to raise funds for energy exploration ventures from individuals as well as institutional lending sources.

Plaintiff Exxon engages in virtually every aspect of the oil and natural gas business from the initial search for and extraction of the raw materials through the various intermediate stages of transportation and refining to wholesale and final retail marketing of the finished products. Although plaintiff owns a number of registered trademarks, most of its business activities are carried out under the trademark "Exxon". Plaintiff uses the mark "Oilex" only on low-grade lubricants.

a) *"Oilex".* Plaintiff uses this mark on lubricants sold to the public. Defendants do not sell any oil or gas products at retail to the consuming public. There is no proximity between products marketed by plaintiff under the "Oilex" mark and any activities of defendants, or any products offered by defendants to the public.

b) *"Exxon".* The trade name "Exxon" is associated with the entire broad range of plaintiff's activities. In considering proximity of products with reference to the mark "Exxon" *vis-a-vis* the names "XOIL" and "Xplor" I confine my consideration to that small portion of plaintiff's business which most closely parallels the defendants' activities.

Defendants' primary activities have been the sale of tax-advantaged limited partnerships in oil and gas ventures, the proceeds from which are used to finance the exploration and development of energy reserves in the United States. Two subsidiaries, XOIL Energy Marketing Group, Inc. and XOIL Brokerage Services, Inc., market oil and gas securities and partnership interests. Other subsidiaries engage in energy research and in the acquisition of interests in properties with potential for coal, oil and gas production.

Plaintiff asks me to find that its products or services are in close proximity with those of defendants in the acquisition of leases. I decline to do so. In acquiring leases both plaintiff and defendants are consumers, not producers of goods and services. Nothing in the leasing activities of plaintiff or of defendants implicates the question of proximity.

Nor is the question of proximity implicated in the raising of capital for oil and gas ventures. Defendants raise such capital by the sale of limited partnership interests. Plaintiff does not raise capital for drilling operations through the sale of limited partnership interests either privately or to the public. When Exxon seeks financing for its

14. To the extent that the name "XOIL" might otherwise have tended to dilute the mark "Oilex" (1923), as dilution is defined under the New York General Business Law, § 368–d, the distinctive nature of the mark "Oilex" may already have been diluted by "Exoil" (1956) and "XerOil" (1963).

oil and gas ventures, it resorts to the sale of bonds guaranteed by it. Such securities are fundamentally different from the limited partnerships which defendants sell for the same purpose.

c) *"XON"*. Quite apart from other infirmities in plaintiff's claims of infringement with respect to the ticker symbol "XON" (see p. 1019, *supra*), there is a lack of proximity of product between the stocks and securities to which that symbol pertains and the securities of defendants with the symbol "XOIL".[15]

XOIL is a non-listed stock and trades in the over-the-counter market while Exxon stock is listed on the principal exchanges. Plaintiff's stock has sold in the $70 per share range during this suit, while the price of defendants' XOIL stock has ranged from $4 per share at issuance to $16 per share.

Since the securities of these two companies do not sell in the same price range or in the same markets, I conclude that they are not in close proximity.

Even to the extent that defendants engage in the sale of crude oil and unprocessed gas, there is only an apparent proximity of product. The crude oil and unprocessed gas produced by defendants are sold to public utilities or to public pipeline companies. Some of that produced by plaintiff is also sold to public pipeline companies. However, given the nature of plaintiff's business, it would be logical to assume that the plaintiff's enormous crude oil demands require plaintiff to take the bulk of any Exxon-produced crude oil itself, to refine it and ultimately to retail it directly to the consuming public.

4. *Likelihood that plaintiff will bridge the gap.*

■ The principal business activity of the defendants in which they come into contact with the public is that of selling tax shelters in the form of limited partnerships in oil and gas drilling ventures. There is little likelihood that now, or in the foreseeable future, plaintiff will engage in the sale of such limited partnerships. Nor is there any realistic likelihood that members of the investing public anticipate, or will anticipate in the future, that plaintiff will market such tax shelter investments. *See E.I. DuPont de Nemours & Co. v. Yoshida International, Inc.,* 393 F.Supp. 502, 517 (E.D.N.Y.1975).

5. *Actual Confusion.*

■ There is presently no evidence of actual confusion between plaintiff's mark and defendants' names, or with respect to plaintiff's products and those of defendants. Lack of actual confusion is a relevant factor in assessing the likelihood of confusion:

While a plaintiff need not prove actual confusion in order to prevail, *W.E. Bassett Co. v. Revlon, Inc., supra,* 435 F.2d [656] at 661–62; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra,* 411 F.2d [1097] at 1100–01; *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,* 281 F.2d 755, 761 (2d Cir.1960), "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975). *Accord Blue Bell, Inc. v. Jaymar-Ruby, Inc., supra,* 497 F.2d [433] at 435–36 [(2d Cir.1974)].

*McGregor, supra,* 599 F.2d at 1136.

There has been, in fact, little evidence offered by plaintiff on the subject of actual confusion, aside from a survey conducted by attorneys associated with its law firm, in which some of the survey respondents associated the word "XOIL", either alone or in conjunction with other words, with plaintiff.[16]

---

**15.** Plaintiff has not claimed infringement of the symbol "XON" by the securities symbol for Xplor Energy Corporation, "XPLR".

**16.** Four associates of the plaintiff's law firm approached individuals waiting for trains at commuter rail stations in the vicinity of New York City. On April 14, 1980, the associates recorded the answers of 97 interviewees to certain questions—the so-called "White Test." On April 16, the same associates recorded responses of 97 commuters to the same questions—the so-called "Green Test". The Green Test and the White Test differed only in that

Surveys have often been deemed admissible in trademark proceedings. The more frequently discussed issue in such circumstances is the weight to be given to such surveys:

> There is substantial authority to support the admissibility of properly conducted surveys in trademark infringement cases, as well as other types of cases. E.g., *President and Trustees of Colby College v. Colby College—New Hampshire,* 508 F.2d 804, 809 (1st Cir.1975); *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445, 446 (5th Cir.1973); *Rosado v. Wyman,* 437 F.2d 619, 627–29 (2d Cir. 1970), *aff'd without opinion,* 402 U.S. 991 [91 S.Ct. 2169, 29 L.Ed.2d 157] (1971); *Bank of Utah v. Commercial Security Bank,* 369 F.2d 19, 27 (10th Cir.1966), *cert. denied* 386 U.S. 1018 [87 S.Ct. 1374, 18 L.Ed.2d 456] (1967); *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co.,* 349 F.2d 389, 395–96 (2d Cir. 1965), *cert. denied,* 383 U.S. 942 [86 S.Ct. 1195, 16 L.Ed.2d 206] (1966) . . . The more relevant issue was the weight to be given to the surveys.

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1341 (2d Cir.1975).

the White Test interviewees were shown a color copy of the front of the defendants' 1979 XOIL Oil and Gas Investment Program, while the Green Test interviewees were shown only a placard bearing a copy of the name "XOIL" alone. There follows the text of the questionnaire used by the law firm associates in conducting the interviews:

*Personal Interview*

Hello, my name is ——————. We are conducting a public opinion study about company names and would appreciate your answers to a few questions. It won't take more than three or four minutes of your time. We need *not* know your name or address and are not asking you to purchase, subscribe to or try anything.

(1) What first comes to your mind when you see and hear the word XOIL? (Showing stimulus and pronouncing xoil).

(2) *Would you tell me why this comes to* your mind?

(3) What else, if anything, comes to your mind?

(4) Would you tell me why this comes to your mind?

I accord plaintiff's survey no weight in the determination of the issues before me. It was not taken under market conditions. The interviewees were consciously selected "by approaching members of the public from affluent areas who appeared to be prosperous and a businessman or professional type of individual." [17] Only 97 respondents were interviewed in each of the two segments of the survey. All of the interviewees came from the vicinity of New York City. Thus the survey was not conducted on a properly selected and representative sample of the population.

While plaintiff made "a conscious effort . . . to select respondents likely to be active investors in securities or in tax shelters, high risk investment of the kind offered by defendants . . ." [18] there is no evidence that those planning, and those conducting, the survey had any training or skills in sampling techniques. Nor can it seriously be contended that a survey predicated upon interviews with 194 persons chosen as the interviewees here were chosen will support projection over a broad geographical base, or conclusions predicated thereon: [19]

> [I]t is difficult to envision one hundred fifty persons in a single geographical area as an adequate sampling of the United

(5) What services or products, if any, *other* than oil and gas investment programs, do you think might be offered by the people who use the name XOIL?

(6) What names *other* than XOIL, if any, do you think they might use on such other services or products?

(7) What other company, if any, do you think they might be affiliated or associated with?

(8) Why do you believe they might be affiliated or associated with [company named in 7 above]?

(9) My last question is for statistical and evaluation purposes only. Would you mind telling me whether you own any securities in which you invested $5,000 or more?

Thank you very much.

17. Affidavit of Robert B.G. Horowitz, August 1, 1980, ¶ 5.

18. *Id.*

19. Plaintiff's goods and services are sold throughout the country: defendants offer limited partnerships in 28 states.

States consumer market for any product . . .

*General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716, 737 (W.D.Mich. 1964).

Nor is there evidence that any substantial efforts were made to eliminate suggestion as the survey was conducted. Thus large signs bearing plaintiff's logo were visible from some of the test sites or on the way to some of the test sites.[20]

6. *Good faith on the part of defendants in adoption of their names.*

 Recognizing that plaintiff has had only limited discovery to date, I do not find evidence in the record before me indicating that defendants adopted the challenged names in other than good faith, nor do I find evidence of a deliberate intent to trade on the plaintiff's good will by selecting names designed to suggest an association with the plaintiff.

7. *Quality of the Defendants' Product.*

The defendants' "product" consists of limited partnerships in oil and gas drilling programs. I find no basis for assessing the quality of that product, one way or the other. Underlying the limited partnership interests are defendants' activities in oil and gas exploration: as of May 21, 1980 defendants had drilled 102 wells, 83 of which became producing wells.

8. *Sophistication of the Market.*

 The principal focus of defendants is on tax shelters related to oil and gas exploration. The limited partnerships defendants offer are available only to those a) who demonstrate a net worth of $200,000 exclusive of home furnishings and automobiles; or b) who demonstrate income placing them in the 50 percent income tax bracket, and a

net worth of $50,000 excluding those same items. Concededly a large net worth is not, in and of itself, proof of a high degree of sophistication. However, those who make investments ranging from $5,000 to $60,000 as do the investors in defendants' limited partnerships, do tend to be discriminating purchasers:

> [O]ther things being equal, confusion is less likely where goods are expensive and are purchased after careful consideration than where they are purchased casually.

*Magnaflux Corp. v. Sonoflux Corp.*, 231 F.2d 669, 671 (C.C.P.A.1956). *See also Alixandre Furs, Inc. v. Alexandros Furs, Ltd.*, No. 80 Civ. 6092 (S.D.N.Y. January 30, 1981) (order denying preliminary injunction) (purchasers of high fashion fur wearing apparel costing up to several thousand dollars are sophisticated buyers and could be expected to exercise a high degree of care when making such purchases); *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716 (W.D.Mich.1964) (average buyer of CADILLAC cars or CADILLAC boats is "sufficiently sophisticated to be persuaded principally by the quality of the product and its intended use rather than the source of supply"); *Sears, Roebuck & Co. v. Allstate Driving School, Inc.*, 301 F.Supp. 4 (E.D.N.Y.1969) (driving instructions are "not inexpensive, and it would be unreasonable to assume that purchasers of such instruction make hasty decisions"); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979) (buyer of a "big ticket" item such as carpeting would ordinarily be expected to be more careful in buying than the impulse buyer of a relatively inexpensive item); *Minnesota Min. & Mfg. Co. v. Electronic Memories, Inc.*, 455 F.2d 1391 (C.C.P.A.1972)

---

20. The evidentiary value of plaintiff's survey is lessened considerably by the absence of practices and procedures which courts have found useful in assessing the validity of survey results in trademark infringement cases, including: use of only non-leading questions; verification by reinterviewing a substantial portion of those interviewed; design by qualified experts; and administration by impartial interviewers. *See James Burrough, Ltd. v. Sign of Beefeater, Inc.*,

540 F.2d 266, 278 (7th Cir.1976); *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385 (7th Cir.1976); *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670, 680–686 (S.D.N.Y.1963), cited in *Grotrian, supra*, 523 F.2d at 1341.

Plaintiff has indicated that it wishes to conduct another, presumably more scientific, survey prior to a full trial.

(purchasing agents buying expensive and highly sophisticated electronic memory devices for computers are unlikely to be confused by the differences between marks "3M" and "EM", despite similarity of appearance of the logos and the sounds of the two marks).

Plaintiff argues that purchasers over-the-counter of XOIL Energy Resources, Inc. stock, at a relatively low price, do not partake of the sophistication of investors in limited partnerships. Plaintiff also suggests that those who invest in defendants' over-the-counter stock and in its limited partnerships may in fact be quite unsophisticated, and be directed to those investments by their brokers.

I do not credit these arguments.[21] A market is not rendered less sophisticated because business in that market is ordinarily transacted through brokers. To the contrary, the brokers render a market, if anything, more sophisticated: professional buyers are less likely to be subject to confusion. *See* 3 R. Callman *Unfair Competition Trademarks and Monopolies* § 81.2(b) (3d ed. 1968); 2 J. McCarthy, *Trademarks and Unfair Competition* § 23.29 (1973).

I realize "the expertise of purchasers does not always assure the absence of confusion." *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir. 1970), and cases cited therein. The relevant test is, however, the *likelihood* of confusion. "A mere possibility would not be enough." *Grotrian, supra*, 523 F.2d at 1342, n. 20, citing *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 717 (9th Cir.1974). *See also McGregor, supra* at 1138 ("the crucial issue is confusion on the part of an 'appreciable number' of consumers"), citing *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978); *Scarves by Vera, Inc. v. Todo Imports, Ltd.*, 544 F.2d 1167, 1175 (2d Cir.1976) (trademark owner must show

that a junior user's conduct is likely to mislead "many customers"); *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.*, 348 F.Supp. 578, 582 (S.D.N.Y.1972) ("The remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us"); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir.1978) ("Ownership of a trademark does not guarantee total absence of confusion in the marketplace.").

In the absence of any credible evidence of actual confusion, the sophistication of those who purchase in the only markets in which defendants sell to the public tends to make the possibility of confusion in the future less likely.

*9. Harm to defendants versus benefit to plaintiff.*

█ If a preliminary injunction were issued, defendants stand to lose the time and money they have invested in their good will and public recognition of corporate names. Defendants' businesses are miniscule in size compared to plaintiff, and their capacity to continue to grow, or even to continue to function effectively, might be adversely affected.

The major dangers which plaintiff foresees from the activities of defendants of which it complains are a) to itself in the competition with defendants for oil and gas leases and drilling equipment purchase or rental; and b) to plaintiff and the public from defendants' securities activities. Thus the benefits to be derived by plaintiff, if a preliminary injunction were to be granted, would be the elimination of these dangers.

The investing public is by definition a risk-taking group and by observation an astute one. Therefore, harm to plaintiff (or to the public itself) arising from investor confusion is unlikely. The prospect is re-

---

**21.** There may, in fact, be some considerable overlap between investors in the limited partnerships and those who thereafter invested in defendants' over-the-counter stock. Transference aside, I presume that the ordinary purchaser in the stock market is sufficiently sophisticated to discern readily the differences between plaintiff's securities and those defendants sell. There are few cases on "likelihood of confusion" in regard to the names of securities traded, but purchasers of securities can ordinarily be expected to be able to distinguish even minor differences between different securities.

**1024**

mote that any of defendants' activities will hamper plaintiff in raising needed capital. In short, plaintiff's benefit from the proposed injunction would be slight.

Weighing "the serious harm an injunction would cause the defendant[s] as against the trifling benefit to the [plaintiff]," *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir.1964), the balance is in favor of the defendants. Certainly no finding is possible, at this stage, that the harm to plaintiff will be irreparable if a preliminary injunction is not granted.

SO ORDERED.