**MARKER INTERNATIONAL, Plaintiff,**

v.

**Gregory deBRULER, an individual; Debco International Trading, Ltd.; Marker Surf America; and Doe Entities A through X, Defendants.**

**No. 85–C–1018S.**

United States District Court,
D. Utah, C.D.

Feb. 7, 1986.

---

John Ashton and Robert G. Wing, Prince, Yeates & Geldzahler, Salt Lake City, Utah, for plaintiff.

Damian C. Smith and Stanley J. Preston, Snow, Christensen & Martineau, Salt Lake City, Utah, for defendants.

## MEMORANDUM DECISION

SAM, District Judge.

This matter is before the court on Defendants' Motion for Reconsideration or in the Alternative for Stay of Injunction Pending Appeal. Upon review of the parties' pleadings, documents, and memoranda, the court hold, rules, and finds as follows:

## DECISION

The court notes at the outset that the Federal Rules of Civil Procedure do not provide for a Motion for Reconsideration as requested by defendants. Defendants' reference to the court's Rule 42(b) discretionary power to dispose of a case in stages and to the interlocutory nature of rulings made at those various stages has no relevance here where the court has granted plaintiff's Motion for Partial Summary Judgment as to all claims of unfair competition and trademark infringement arising in this action against defendants Gregory deBruler, Debco International Trading, Ltd., and Marker Surf America. The following Memorandum Decision will include the court's findings of fact and conclusions of law in support of its ruling.

## THE PARTIES

Plaintiff, Marker International, is a Utah corporation concerned with the manufacture, distribution, and sale of Marker ski bindings and related ski equipment. Northwest Energy Company ("Northwest"), a non-party to this action, created Marker International as an acquiring company in which to place ski-related assets and subsidiaries purchased from Hannes Marker, the originator of the Marker ski binding. Defendants Greg deBruler, Cyndy deBruler, and Stan deBruler are the owners and operators of Debco International Trading, Ltd. ("Debco"), a Washington corporation formed to distribute sailboards of various origins. Defendant Marker Surf America is a company originally created by the deBrulers and Debco for the express purpose of the United States distribution of Marker Surf sailboards and other products developed by Hannes Marker.

The controversy between the parties centers on the propriety of Debco's use of the name Marker Surf America and the sloping "M" logo in its advertising and distribution of sailboards neither manufactured nor controlled by Hannes Marker or Marker International, the owner of the "Marker" trademark.

## JURISDICTION

Plaintiff seeks to enjoin deBrulers and Debco from manufacturing, distributing, or selling sailboards or any other product related to the sporting good industry that bears the name Marker in any form in conjunction with the sloping "M" logo. It alleges that such activity constitutes: (1) trademark infringement in violation of the 15 U.S.C. § 1114(1); (2) infringement of the common law trademark owned by Marker International; and (3) unfair competition and false designation of the origin and sponsorship of Marker Surf America's goods in violation of 15 U.S.C. § 1125(a).

Subject matter jurisdiction is asserted under 15 U.S.C. § 1121 by virtue of plain-

tiff's § 1114(1) (infringement of a federally registered mark) and § 1125(a) (unfair competition and false designation of origin) claims. The state cause of action is properly before the court under the doctrine of pendent jurisdiction. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## FACTS

In 1952, Hannes Marker, a resident of Germany, developed a line of ski bindings and ski equipment that was sold under his family name, "Marker." He later introduced the equipment in the United States using the Marker name to advertise and distinguish his products which, since 1953, have been sold continuously in this country by Hannes Marker and his successors in interest. Marker Affidavit at 2, paragraph 2. Both parties to this suit agree that the Marker name is well-recognized as standing for high quality in the sporting goods industry. Greg deBruler Deposition at 25. Between the years 1953 and 1980, Hannes Marker organized and managed several subsidiaries involved with marketing sporting equipment internationally. Each of the subsidiaries included the Marker family name in its corporate title.[1]

In 1974, Hannes Marker began manufacturing sailboards and equipment related to windsurfing or sailboarding under the name "Marker Surf." On May 20, 1981, Hannes Marker agreed by letter to sell the Marker name, trademark and logos together with assets of all the various subsidiaries to Northwest Energy Company. The terms of the letter were memorialized by written contract approximately two weeks later, and Northwest placed the Marker assets in plaintiff Marker International, a Utah corporation. *Id.* Northwest and Hannes Marker agreed in the contract that Northwest would not assume the assets of Marker Surf[2] and that Hannes Marker could continue to use the Marker family name in connection with Marker Surf, but that he was prohibited from using the Marker trademark[3] on Marker Surf products. Hannes Marker was permitted to retain use of the sloping "M" trademark that had been placed on Marker Surf products since 1974.[4] The configuration of the sloping "M" is identical to that of the letter "M" that commences the Marker trademark. The agreement further prohibited Hannes Marker from selling the Marker family name or trademark to third parties in the sport business.[5] The parties lined out of paragraph seven the following sentence: "The new company shall have the right of first refusal for the distribution and marketing of Marker Surf products worldwide except in Germany, Austria, and Switzerland." By making the above deletion, Northwest indicated it did not desire

---

**1.** Among the subsidiaries created were: Hannes Marker Sicherheits-Skibindungen GmbH & Co. KG, Marker Innsbruck, Marker Patentverwertungsgesellschaft mbH, Marker Vertriebsgesellschaft mbH, Marker France, Marker U.S.A., and Marker Japan. Hannes Marker Deposition at 2.

**2.** Paragraph one of the agreement provides in relevant part: "Northwest Energy will cause the formation of a new holding company, ... which new company will own or control all of the assets of all of the existing 'Marker' companies, including, but not limited to, trade marks, lands, buildings, securities, inventories, patents, patent rights, licenses, agreements, accounts, and case, excluding, however, the whole of the Marker-Surf business and related agreements...."

**3.** On March 18, 1981, Marker International filed a trademark application with the United States Patent and Trademark Office seeking protection

for the name "Marker" in a sloping configuration. The trademark was issued May 17, 1983.

**4.** Mr. Marker has personally used the "M" logo since 1972 when it was registered in West Germany. "The logo was submitted to the United States Patent Office on the 16th of August, 1981 in the name of Hannes Marker Sicherheits-Skibindungen GmbH & Co. KG by Registration No. 1238200." Marker Deposition at 4. The sloping M mark was registered by the United States Patent and Trade Office on May 17, 1983. *Id.*

**5.** Paragraph seven of the agreement states in part: "Mr. Marker has the right to *use* his family name, but not the Marker Trademark on its surf products. Marker-Surf may *use* the initial 'M' as a trade mark on its surf products. Mr. Marker may not sell his family name to third parties in the sport business...." (Emphasis added).

to distribute or market Marker Surf products. Both Northwest and Hannes Marker agree that by the above-mentioned contract, Hannes was merely granted the *use* of the Marker family name and the sloping "M" so long as he should continue to be "the principal in the company known as Marker Surf." Marker Affidavit, paragraph 6; Tauber Deposition at 40. In the event he ceased to be the principal or majority owner thereto, "the name Marker Surf would no longer be used with that company, and in fact any and all rights to the name Marker in connection with Marker Surf and the sloping M would revert to Northwest Energy." Marker Affidavit, paragraph 6.

Defendant Gregory deBruler had a background of selling or distributing various products for short periods of time and under several different auspices, including foreign food items, Indian artifacts, jewelry, fine metals, baby thermos bottles, storm windows, insulation, and pollution control devices. Greg deBruler Deposition at 7–11. In 1980, deBruler began importing and distributing "Seamate" sailboards, a Taiwanese product, as well as another line of sailboards. At that time, he formed a company, Debco International Trading, Ltd., that was completely owned and operated by him, his wife, Cyndy deBruler, and his father, Stan deBruler. *Id.* at 5; Defendants' Memorandum of Points and Authorities in Support of a Motion for Summary Judgment at 2.

In November, 1982, Greg deBruler initiated contact with Hannes Marker and later met with him in West Germany to request authorization for the deBrulers d.b.a. Debco to act as executive distributor of Marker Surf products in North America.[6] Greg deBruler Deposition at 15. Under the distributorship agreement that resulted from deBruler's proposal, he was required to buy for distribution during the 1982–83 year, a minimum of 500 boards made in Germany by Marker Surf. *Id.* at 20. The distributorship agreement also allowed Debco to use the name Marker Surf America in connection with deBruler's distribution of the German product as long as either party did not terminate the agreement. Paragraph 12(a) therein specifically provides that the right to use the Marker name would expire immediately upon notice by either Hannes Marker or Greg deBrulers.[7] Paragraph two prohibited Debco from purchasing either sailboards or components of sailboards from third parties without Hannes Marker's written consent, and required that Debco should use the Marker trademark solely for application to Marker products. In his deposition, Greg deBruler admits he clearly understood that if the distributorship arrangement between Hannes Marker and Debco terminated, Debco and deBruler would lose the right to distribute sailboards under the Marker Surf name.[8] Greg deBruler Deposition at 24, 25. After entering the agreement, Greg hired five Debco sales representatives to aid in marketing Marker Surf America products throughout the United States. *Id.* at 28.

In December, 1983, Hannes Marker decided to terminate his contract with Debco because of his dissatisfaction with their past business relationship.[9] In a registered

---

**6.** At the time of Greg deBruler's first contact, Mr. Marker was acting as president and HGMb Surf.

**7.** Paragraph 12(a) of the English translation of the November 26, 1982 agreement states: "Debco is entitled to use for the purpose of distribution of Marker Surf products the name 'Marker Surf America'.... the right to use the name 'Marker Surf America' expires automatically in case this agreement is totally terminated or in case one of the parties has cancelled this agreement."

**8.** Q: (by Mr. Ashton) Did you understand by the terms of that agreement, if the distributorship was terminated, you could no longer use the name?
A: (by Mr. Debruler) Yes.
Q: So you don't dispute that your right to use the name was based in the grant of the right from Marker surf, do you?
A: No.

**9.** Hannes Marker cited as reason for his dissatisfaction deBruler's "failure to understand the United States market and to purchase the quantity of boards he indicated he would purchase in the United States." Marker deposition at 6.

letter to deBruler dated December 19, 1983, Hannes gave the requisite notice of termination as follows: "In accordance with our agreement, I herewith give notice to terminate (I want to quit) our contract concerning the exclusive right to sell Marker Surf products in the US [sic]."

On February 1, 1984, Marker Surf and Debco entered a subsequent agreement that extended the distributorship until August 30, 1984 and was renewable only if the parties determined the past season had been successful. The contract required that the deBrulers and Debco should purchase a minimum of 900 surfboards during the 1984 year and should issue a letter of credit in the amount of 180 Deutsche Mark. Paragraph five permits Greg deBruler to make his own board design for the United States market with all changes in board designs being made at his expense. DeBruler was also allowed by that contract to use the Marker Surf name and the "M" logo on the boards that were manufactured in accordance with the terms of the agreement.

During 1984, Marker Surf encountered difficulty in obtaining masttacks for its sailboards, and Greg deBruler failed to open a letter of credit as contracted. Debco and deBruler purchased no sailboards from Marker Surf, but rather purchased 100 sailboards directly from companies located in Israel that were marketed under the Marker name. However, the sailboards did not arrive from the Israeli manufacturer until September, 1984 and were not in a condition to be sold on arrival, so the 1984 season was what Greg deBruler termed a "disaster." Greg deBruler Deposition at 9.

Sometime after entering the February, 1984 agreement, H.G.M. Surf, a German corporation which Hannes Marker formed to succeed Marker Surf GmbH, filed bank-

ruptcy in Germany and was liquidated. Marker Affidavit at 9. On July 3, 1984, Hannes telexed to Greg deBruler news of the bankruptcy and stated the following:

I was only allowed to use the name Marker Surf in case I would be majority owner. You only may sell the boards of that season, but the name Marker Surf is going back to Northwest Energy who has the registered rights in the States for the name and logo.

DeBruler did not respond in any way to that telex and made no effort to contact Northwest Energy or Marker International concerning the use of the name Marker Surf. Greg deBruler Deposition at 59. On one occasion, the exact date of which is unclear, Greg deBruler telephoned Henry Tauber who was then acting as the president of Marker International. Tauber informed him that Marker International had purchased all rights to use the Marker name and that Greg should terminate his use of it immediately. Id. at 60, 63. Tauber and Hannes Marker believed the deBrulers and Debco had ceased to use the Marker name and sloping "M" logo after Hannes' July, 1984 termination of the distributorship agreement and the lapse in August of the February, 1984 agreement. Tauber Deposition at 44, 56, 62, 63; Marker Affidavit, paragraph 7.

DeBruler claims that he disregarded these notices on advice of counsel and because he did not think they were important.[10] In September, 1984, he ordered a shipment of 500 to 700 sailboards from the Israeli company, consisting of four different models each showing the Marker Surf logo,[11] which were to be used for the 1985 season. Id. at 74, 75. The court notes the shipment was ordered after Hannes Marker unequivocally terminated any distributorship agreement that existed between the deBrulers and him and after the August,

---

**10.** Upon learning of the liquidation or Marker Surf GmbH, Greg deBruler's attorney advised him that Debco could obtain common law rights to the Marker Surf tradename and the one-dimensional "M" trademark on the basis of his prior usage of the same. Greg deBruler Affidavit, paragraph 9.

**11.** The Marker Surf America logo consists of a large sloping "M" captioned with the words "Marker Surf America."

1984 expiration (by its own terms) of the February, 1984 distributorship agreement. In his deposition, Greg deBruler stated that he continued to used the Marker trademark after the termination of the distributorship agreement because Hannes Marker's fine personal reputation and the longstanding tradition for the high quality of Marker products would aid in the sale of his sailboards and because he believes people probably associate the quality of Marker ski bindings with Marker Surf America sailboards. *Id.* at 79. DeBruler further confirmed that he believes a significant number of skiers also participate in sailboarding and that by using the Marker name and logo, he traded off that overlap "to some extent" in promoting his sailboards because "the same folks" are targeted for sales. *Id.* at 78. At the 1985 annual trade show for the ski industry held in Las Vegas, deBruler set up and manned with his salespeople two booths at which his sailboards were displayed under the Marker Surf America name and logo. *Id.* at 76, 77, 78.

In August, 1984, deBruler filed a trademark application for the Marker Surf and one dimensional "M" trademark. Greg deBruler Affidavit, paragraph 9. The trademark examiner responded that he could find no registered mark "which so resembles the applicant's mark, when applied to the goods (or services), as to be likely to cause confusion, or to cause mistake, or to deceive." Greg deBruler Affidavit, Exhibit "B". Plaintiff Marker International has filed an objection to the examiner's finding.

In January, 1985, Tauber discovered an advertisement showing Debco's 1985 line of products being sold under the Marker Surf America name and the sloping "M" logo. Tauber Affidavit, paragraph 8. He immediately contacted his legal counsel, who wrote Greg deBruler a letter of January 11, 1985 which set out very clearly Marker International's position that neither deBruler nor Debco possessed the right to use the Marker trademark, name or logo. When Hannes Marker learned of the deBrulers' continued use of the Marker name and logo, he sent Greg deBruler a reg-istered letter on April 17, 1985 "pleading with him to stop using the Marker name, as he had no rights in the name Marker in connection with name Marker Surf nor in the sloping M logo...." Marker Affidavit, paragraph 11. Receiving no response, Hannes sent a second registered letter in June, 1985 which essentially repeated the first, and again, deBruler failed to respond. *Id.*, paragraph 12. In September, 1985, deBrulers ordered for the 1986 season 700 sailboards showing the Marker name and logo. The order was placed after plaintiff served Debco and the deBrulers with the complaint in this action. Greg deBruler Deposition at 81.

The evidence before the court also includes the affidavit of George W. Hasse, manager of Sports Design, a Las Vegas company involved in the sale of sporting goods, including ski equipment and sailboards and accessories. Hasse attested that he is a seller of Marker ski equipment and that he is well aware of and has high regard for the Marker name, trademark, logo, reputation and following in the ski business. He is also aware that the Marker ski equipment is manufactured, distributed and sold by Marker International. Hasse Affidavit at 2, paragraphs 1, 2. In spring of 1985, Hasse received advertising information concerning the sales of Marker Surf Sailboards and related accessories. After reading the material, he concluded the sailboards advertised were manufactured and distributed by Marker International because "the name Marker was included in the information the 'M' logo was the same as the beginning letter in the Marker logo shown on the ski equipment." *Id.*, paragraph 4. Hasse later approached a Marker International sales representative who informed him Marker International and Marker Surf America were not associated. Hasse stated that had the two companies been associated, he might have purchased the products because he respects the quality of Marker International equipment. However, upon learning the sailboards were not manufactured, distributed or sold by Marker International, he lost

interest in purchasing the equipment. *Id.* at 2, 3, paragraphs 5, 6.

The court also reviewed the affidavit of Duane Bush who is a general partner and general manager of the partnership, Milo Sports Surfing, a Salt Lake City business that retails sailboards and windsurfing equipment. Bush stated therein that Michael Tutt, a sales representative for Marker Surf America, appeared at his place of business, presented his card and indicated he represented Marker. Tutt allegedly told Bush he was selling sailboards that had been manufactured in Israel for Marker, that the quality of the boards could be equated with that of Marker ski bindings and that people in the area liked the ski bindings, so they would be attracted to Marker sailboards. Bush further stated that Tutt showed Scott Phillips, a Milo Sports sales agent, and him a sailboard having the sloping "M" logo and encouraged them to "use the Marker name and its presence in the ski market as a method by which to sell the sailboards" because oftentimes persons who buy sailboards also ski. Bush Affidavit at 1, 2, paragraphs 1, 2. According to Bush, Tutt never indicated to Bush or Phillips that Marker International did not manufacture the sailboards. *Id.,* paragraph 3. Relying on Tutt's representations and the Marker reputation, Bush agreed to purchase several boards for resale in Salt Lake City. The entire shipment of sailboards received by Milo Sports bore the sloping "M" logo. Upon their arrival, Bush met with his sales agents, including Phillips, to discuss associating the sailboards with Marker bindings for advertising purposes as purportedly suggested by Tutt. *Id.,* paragraphs 4, 5. Bush first became aware that Marker International had no connection with or control over the sailboards when, as a named defendant, he was served with a copy of the Summons and Complaint in this action. He attested that even in the absence of Tutt's specific representations connecting Marker International and Marker Surf America, he would have believed the sailboards were manufactured by the same company with which he had been familiar for years. Moreover, if he had known no relationship existed between the two companies, he would not have carried that line of sailboards. *Id.,* paragraphs 6–9.

In his Affidavit, Tutt claims that when he visited Milo Sports he presented his card indicating he was a representative of Marker Surf America and informed the two men with whom he met that the boards were made in Israel and shipped from the State of Washington. He alleges that he "did not discuss with anyone at Milo Sports, nor did anyone ask, about any relationship Marker Surf America and the company that manufactures Marker ski bindings...." Tutt Affidavit at 2, 3, paragraphs 4–7, 9. Tutt asserts that he has never been instructed to try to sell Marker Surf America products as being manufactured by Marker International, that he is seldom asked whether a relationship exists between the two companies, and that the sailboards sell on their own merits. He further indicates that the Milo Sports sales agent was impressed by the shape and quality of the sailboards, the warranty, and the terms of sale offered by Marker Surf America. *Id.* at 2, 3, paragraph 8.

This suit was originally before Judge David Winder who required as a condition to continuing a hearing for a preliminary injunction that deBruler and Debco should send to all sporting goods dealers selling Marker Surf America products a notice that no relationship exists between Marker International and Marker Surf America.[12]

---

12. The following is defendants' form letter, dated November 7, 1985:

TO ALL DEALERS OF MARKER SURF AMERICA PRODUCTS:

You are informed that there is no relationship between our company, Marker Surf America, manufacturers of sailboarding equipment, and Marker International, manufacturers of ski bindings and related equipment.

The latter company does not manufacture or endorse sailboards. These products are manufactured and marketed by Debco, International Trading, Ltd. dba Marker Surf America. You may purchase sailboards and related accessories only through our company.

At the November 27, 1985 hearing on both parties' Motions for Summary Judgment, defendants admitted that notice letters had been sent to only 30 percent of the dealers in Marker Surf America products and indicated that the remaining letters would be sent in the near future.

Upon review of the pleadings, memoranda, affidavits and depositions submitted and after taking oral argument on the matter, this court determined that no material issues of fact remained in dispute and that plaintiff was entitled to summary judgment as a matter of law as to its federal claims of unfair competition and trademark infringement. The issues of damages and attorney's fees were reserved for further hearing.

Defendants subsequently filed the Motion for Reconsideration presently before the court. The court specifically rejects defendants' claim that entry of summary judgment was improper because clear disputes of fact remained to be adjudicated. Defendants can show no material historical fact that lies in dispute; rather, defendants request the court's reconsideration of their characterization of the facts set out by both parties or for the court's reaching therefrom legal conclusions favorable to defendants, neither of which is a proper basis for objection to entry of summary judgment.

As the first point in support of their Motion, defendants assert this court erroneously ruled the 1981 contract between Northwest and Hannes Marker was dispositive of all trademark infringement and unfair competition issues arising in this case. Defendants interpret the court's finding on the contract issue as supporting a holding that plaintiff obtained private rights to the Marker name and the "M" logo in connection with the windsurfing business. Defendants' Memorandum in Support of Motion for Reconsideration at 2. Such interpretation improperly characterizes the court's finding that the 1981 contract controls questions of the ownership of the Marker name, trademark, and logos. The court found that by the express language of the contract, Hannes Marker was permitted *use* of the Marker family name and the sloping "M" in conjunction with his windsurfing business but was prohibited from selling to third parties in the sport business. Even without resorting to parol evidence, it is clear to the court that Northwest intended to prevent loss of control or dilution of its chief asset, the Marker name, the very evils at the foundation of this lawsuit, by permitting Hannes Marker's use of the name only so long as he was in control of the entity using the name and logo. However, where the parol evidence offered by the parties to the contract substantiates that interpretation and where defendants have no direct knowledge of the contract negotiations, the court is persuaded that plaintiff Marker International is the owner of the Marker name and the logos derived therefrom. That ownership includes the actual name Marker written in any configuration when used in conjunction with sporting goods as well as the sloping "M" when combined with the use of the Marker name. The court does not find that plaintiff assumed ownership to the entire Marker Surf America logo as developed by Hannes Marker and defendants, nor is such a finding essential to the court's ruling that defendants' continued use of the Marker name and the sloping "M" logo after Hannes Marker's dissolution of their distributorship agreement amounts to unfair competition and trademark infringement. The finding concerning Marker International's ownership of the Marker name, marks and logos also settles the question as to whether the deBrulers acquired any rights to use the Marker name through the distributorship agreement between Hannes Marker and Debco. On that point, the court holds that inasmuch as Hannes Marker had use privileges for but no longer owned the Marker name or related logos

Thank you very much for your continued support.
Very Truly Yours,

MARKER SURF AMERICA
By Gregory deBruler, President

after the 1981 agreement with Northwest, no transaction entered by him impinged upon plaintiff's right to ownership and protection of the Marker name. The court finds unpersuasive defendants' argument that inasmuch as plaintiff never used the Marker Surf America logo, it has no right to enjoin defendants' use of it.

As will be discussed more fully below, the primary question in trademark infringement and unfair competition cases is whether a defendant's use of a tradename or trademark creates a likelihood that the consuming public will be confused as to the source or sponsorship of the products bearing the name or mark. Equally unpersuasive is defendants' assertion that because the original Marker Surf logo co-existed with the Marker logo for eleven years without any evidence of confusion of source or sponsorship, defendants' use of its logo would not result in the likelihood of confusion. During the period before termination of the distributorship agreement between Hannes Marker and Debco, Hannes remained in control of the use of the Marker name and logo, and as a result, plaintiff retained control of its name and the sloping "M" logo via the 1981 agreement between Hannes and Northwest Energy. However, after termination of that agreement, plaintiff had no nexus with Debco and consequently, no control over the use of the Marker name and logo. The vulnerability of that position provides the basis for plaintiff's request for injunctive relief.

As defendants correctly state, there are other ways to acquire trademark rights than by agreement, and the present case turns on principles of trademark rather than contract law. Therefore, where it appears that neither the dealings between Hannes Marker and deBruler nor the bankruptcy of Marker Surf GmbH provides a legal basis for defendants' assertion of their right to use the Marker name and logo, the court must analyze the instant facts under the same tests that would apply had deBruler and Debco never entered the distributorship agreement with Hannes Marker.

## I. TRADEMARK INFRINGEMENT

Plaintiff's claims arise under 15 U.S.C.A. § 1125(a) [13] which provides a cause of action for any party injured by another's commercial activities that are likely to cause confusion or deceive purchasers into believing that the source of origin of certain goods is a person or company other than their true source. *Scott v. Mego Intern., Inc.*, 519 F.Supp. 1118 (D.C.Minn. 1981); *Nature's Bounty, Inc. v. Super X Drugs Corp.*, 490 F.Supp. 50 (D.C.N.Y. 1980). The ultimate test for both trademark infringement and unfair competition claims is "whether the public is likely to be confused by the similarity of the marks." *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.*, 532 F.Supp. 651, 657 (W.D.Wash.1982); *Warner Bros., Inc., v. American Broadcasting Companies, Inc.*, 523 F.Supp. 611, 624, *aff'd and remanded on other grounds*, 654 F.2d 204 (2d Cir.1981) *on remand*, 530 F.Supp. 1187 (S.D.N.Y.1982). In *Beer Nuts, Inc. v. Clover Club Foods Co.*, the United States Court of Appeals for the Tenth Circuit adopted the factors set forth in *Restatement (Second) of Torts* § 729 (1938) as criteria that must be considered in determining likelihood of confusion. 711 F.2d 934, 940 (10th Cir.1983). Resolution of the likelihood of confusion issue "requires the court to consider numerous factors to determine whether, under all the

**13.** 15 U.S.C. § 1125(a) provides:
Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services or to enter into commerce, and any persons who shall with knowledge of the falsity of such designation of origin or

description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or sued, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, by any person who believes that he is or likely to be damaged by the use of any such false description or representation.

circumstances, there is a likelihood of confusion." *Id.* Those criteria are as follows:

(a) the degree of similarity between the designation and the trademark or trade name in

 (i) appearance;

 (ii) pronunciation of the words used;

 (iii) verbal translation of the pictures or designs involved;

 (iv) suggestion

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers.

*Id.* In its consideration of these individual criteria, this court must apply controlling principles of trademark law including the various burdens of proof placed on the parties and the sufficiency of evidence necessary to make a finding under each criterion.

Plaintiff's burden of proof on the issue of whether likelihood of confusion exists has been set out as follows:

> Actionable violation of this section occurs where a defendant employs a trade name or trademark confusingly similar to that of plaintiff; likelihood of confusion rather than actual confusion is the test; and it is not necessary that false designation of origin or false description be wilful or intentional nor must the consumer believe that the item actually originated with plaintiff; it is sufficient that it appears plaintiff may have sponsored or otherwise approved by defendant's use.

*American Optical Corp., v. North American Optical Corp.,* 489 F.Supp. 443 (D.C.N. Y.1979); *G's Bottoms Up Social Club v. F.P.M. Industries, Inc.,* 574 F.Supp. 1490 (S.D.N.Y.1983).

There exist two forms of confusion, the finding of either of which will satisfy the likelihood of confusion test and thereby support a grant of injunctive relief: 1) confusion of source and 2) confusion of sponsorship. 3A R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 21.07 (4th ed. Supp.1985). Confusion of source arises when "the ordinarily prudent purchaser would be induced to purchase the defendant's product in the belief that he was purchasing the plaintiff's." *Id.* Confusion of sponsorship is present where "the goods are sufficiently different that the defendant's product cannot reasonably be assumed to originate with plaintiff, but the public may be deceived into the belief that there is some connection between plaintiff and defendant which in fact does not exist." *Id.* Finally, although there is some authority to the contrary,[14] this court agrees with the Fifth Circuit's holding that

> [s]econdary meaning is not required to be shown in every trade dress infringement under [15 U.S.C.A. 1125(a) ]; if features of the trade dress sought to be protected are arbitrary and serve no function either to describe the product or assist in its effective packaging, there is no reason to require plaintiff to show consumer connotations associated with such arbitrarily selected features.

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695 (5th Cir.1981), *cert. denied,* 457 U.S. 126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).[15] In

---

**14.** *See, e.g. Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 303 (2d Cir.1981); *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 373 (1st Cir.1980). Defendants cite *Standard Oil Co. v. Standard Oil Co.,* 252 F.2d 65, 75 (10th Cir.1958) as holding that a finding of secondary meaning is essential to a trademark or unfair competition claim. The court disagrees with defendants' reading of that case. The *Standard Oil* court spoke directly to the question of whether marketing surveys are admissible to show secondary meaning but did not explicitly

hold that a finding of secondary meaning is essential to its plaintiff's trademark infringement and unfair competition claims. This court is not persuaded that the mere inference that a finding of secondary meaning is required overcomes the sound reasoning in *Chevron. Chevron Chemical Co.,* 659 F.2d at 702, 703.

**15.** "[T]rademark law requires a demonstration of 'secondary meaning' only when the claimed trademark is not sufficiently distinctive of itself to identify the producer." *Chevron Chemical*

any event, where the name Marker in combination with any form of the Marker logo has neither generic, descriptive or suggestive elements, but rather is an arbitrary or fanciful name and mark, it is considered a "strong mark entitled to the widest protection possible." *Exxon Corporation v. Xoil Energy Resources, Inc.*, 552 F.Supp. 1008, 1014 (S.D.N.Y.1981).[16] Furthermore, as the *Chevron Chemical* court correctly reasoned, the primary question in trademark infringement and unfair competition claims is whether or not the public is likely to be confused, rather than whether the senior user's trademark has acquired secondary meaning. *Id.* at 703. If likelihood of confusion is demonstrated, irreparable injury is presumed, and plaintiff is entitled to injunctive relief. *Eli Lilly and Company v. Revlon, Inc.*, 577 F.Supp. 477 (S.D.N.Y. 1983); *Exxon Corporation*, 552 F.Supp. at 1020.

With these general principles in mind, the court is prepared to analyze the instant facts under the criteria set out in *Beer Nuts*.

A. *The degree of similarity between the designation and the trademark or trade name.*

The *Beer Nuts* court listed four indicia of similarity between marks that must be examined: (1) appearance; (2) pronunciation of the words used; (3) verbal translation of the pictures or designs involved; and (4) suggestion. In its contrasting of the appearance of the two marks at issue, the court must be guided by the well-settled

rule that "[i]n trademark infringement cases, the degree of similarity is not to be considered in a vacuum," but from the overall impression of prospective purchasers; it does not require element by element comparison. *Exxon Corporation*, 552 F.Supp. at 1016; *See also, New England Fish Co. v. The Hervin Co.*, 511 F.2d 562, 563 (C.C.P.A.1975).

Upon examination of the exhibits showing the Marker logo and the various styles of the Marker Surf America logo, the court is convinced that the use of the Marker name in conjunction with the sloping "M" which, as the court stated above, is identical to the "M" that commences the Marker trademark, would create the overall impression that the Marker Surf America products were sponsored by the well-established manufacturer of Marker ski equipment.[17] The court finds unpersuasive defendants' claim that because some of the Marker Surf America advertising material shows the sloping "M" in a three-dimensional rather than a one-dimensional configuration, the use of the "M" so materially differs from the use of the "M" in the Marker trademark as to negate any possibility of confusion in the public mind. Where the basic configuration of the sloping "M" remains constant throughout the Marker Surf America advertising material, the mere change of color or dimension does not alter this court's finding that the similarity of appearance test is met when that sloping "M" is used in combination with the Marker name and particularly when

Co., 659 F.2d at 702. In the present case, Hannes Marker or his affiliates have been the sole suppliers of Marker equipment in the sporting goods area for twenty-three years. From the affidavits, depositions, and statements before the court, including defendant Greg deBruler's deposition, there appears strong evidence that the Marker family name has acquired sufficient status within the sporting goods industry to support a finding of what would amount to a secondary meaning. However, as stated above, in the court's opinion, such a finding is not vital to its ruling on this plaintiff's trademark and unfair competition claims.

16. Indeed the court in *Beer Nuts* spoke to the necessity of finding of secondary meaning only

where the trademark is descriptive. *Beer Nuts*, 711 F.2d at 940. The Marker name, trademarks, and logos are not descriptive, but rather arbitrary or fanciful, and the finding of secondary meaning is not essential to the court's analysis of the issues at bar.

17. The court recognizes that the trademark examiner found that likelihood of confusion would not be created by registration of the Marker Surf America trademark. However, the decisions of the Patent and Trademark Office are not *res judicata* in a subsequent infringement suit because the court has the discretion to rectify the register of any party to a suit. 3A R. Callmann, *supra*, at 25, § 20.66.

both the name and the logo are coupled with reference to tradition for excellence. Nor is the court moved from this finding by defendants' argument that the addition of the words "Surf America" to the Marker name removes the confusing similarity. A defendant in a trademark infringement or unfair competition case cannot prevail by simply adding a word to the one it shares with the plaintiff. "Courts have repeatedly held that the confusion created by use of the same word as a primary element in a trademark is not counteracted by the addition of another term." *Continental Connector Corporation v. Continental Specialties Corporation,* 492 F.Supp. 1088, 1095 (D.Conn.1979). Equally futile is defendants' attempt to persuade the court that finding the use of the sloping "M" creates a confusing similarity is tantamount to finding that the isolated use of the remaining letters of the Marker name, that is, the "A," "R," "K," "E," or "R," would obtain the same result. Again, it is the total impression created by the use of the name and logo that must be examined for purposes of finding a likelihood of confusion. Furthermore, the court is solely concerned with the marks directly before it and finds no public policy reason to reach beyond the present issues. Finally, the court is unconvinced defendants' notification of its dealers that Marker Surf America is not associated with Marker International would serve the same remedial purpose as would injunction, that is, to prevent confusion in the minds of the consuming public, because notification of the dealers does not materially alter the overall impression and associations created in the minds of the public by the coupling of the Marker name with the sloping "M" logo.

The second indicant of similarity, e.g. pronunciation of the words used, is relevant to these facts only in the sense that the name Marker is used in both logos and obviously enjoys one pronunciation. The court also finds that where there are no pictures per se involved in the competing logos, the same reasoning employed in determining the similarity of appearance obtains in determining the final two indicia, i.e. similarity of verbal translation of the pictures or designs involved and suggestion.

## B. *The intent of the actor in adopting the designation.*

 Of the four major criteria set out in *Beer Nuts,* the court finds this the most determinative in its finding of whether trademark infringement or unfair competition has occurred in this case. Although a showing of actual intent to confuse and mislead as to the source of sponsorship is not required to obtain equitable relief under § 1125(a) (*Lacoste Alligator, S.A. v. Bluestein's Men's Wear, Inc.,* 569 F.Supp. 491, 499 (D.S.C.1983)), the intent of the party adopting the allegedly infringing mark is an important element in determining whether the confusing similarity standard has been met. *Ortho Pharmaceutical Corp. v. American Cyanamid Co.,* 361 F.Supp. 1032 (D.N.J.1973). "Defendants intent to 'bask in the reflected popularity of plaintiff's name' is significant in a trademark infringement action in that it creates a presumption that the name chosen will in fact infringe upon plaintiff's mark." *Id.* at 1043 *citing Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 158 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). In support of the above holding, *Ortho Pharmaceutical* refers to the Restatement of Torts as follows:

> [If defendant] adopts his designation with the intent of deriving benefit from the reputation of the trademark or tradename, his intent may be sufficient to justify the inference that there is confusing similarity. Since he [the defendant] was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy, is highly persuasive. His denial that his conduct was likely to achieve the result intended by him will ordinarily carry little weight.

*Restatement of Torts* § 729, comment f (1938), *quoted in," Ortho Pharmaceutical,*

361 F.Supp. at 1043; *See also National Football League*, 532 F.Supp. at 660.

Even if this court were presented with no evidence indicating the deBrulers' presence or lack of intent to benefit from their use of the Marker name and its reputation, it would be forced to conclude that the only conceivable reason for Debco's use of the name and the sloping "M" logo was to trade off plaintiff's reputation and good will. However, the court need not resort to speculation concerning the deBrulers' reasons for continuing to use the Marker name after the termination of their distributorship agreement with Hannes Marker. As set out in the Findings of Fact above, Greg deBruler stated without equivocation that he continued to use the Marker name and sloping "M" logo because of the fine reputation for quality that surrounded Marker ski bindings and because he believed people might associate that reputation with the Marker Surf America products.[18] Further, the fact that deBrulers manned a booth at the annual national ski show underscores Greg deBruler's testimony that he believes many of the same customers are targeted for sales in the ski and sailboard industries.[19] When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark. "The Courts accept the business judgment of the defendant in those matters and from such intent presume a likelihood of confusion." *Fotomat Corp. v. Cochran*, 437 F.Supp. 1231, 1243 (D.Kan.1977); *See also National Ass'n of Blue Shield Pl. v. United Bankers L. Ins. Co.*, 362 F.2d 374, 377 (5th Cir.1966); *National Lead Company v. Wolfe*, 223 F.2d 195, 202 (9th Cir.), *cert. denied*, 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955); *Wells Fargo & Co. v. Wells Fargo Express Co.*, 358 F.Supp. 1065, 1091 (D.Nev.1973). The court notes that while the deBrulers strongly assert that their products sell on their own merits and are even superior to the original Marker Surf equipment, they do not market their products under the Debco name or another of their design but rather, of all the names available, they continue to use the Marker name. As per the above-cited authorities, that activity, without more creates a presumption of likelihood of confusion. When such a presumption arises, it "rests with the imitator to disprove the natural inference that he intended to create confusion, even in the absence of further proofs." *Time v. Ultem Publication, Inc.*, 96 F.2d 164 (2d Cir. 1938). The court finds defendants failed to rebut that presumption of likelihood of confusion. It is of no moment that defendants believed they were within their rights in their use of the Marker name and sloping "M" logo after Hannes Marker terminated the distributorship agreement and put them on notice that further use of the name and logo subjected defendants to potential liability because "[c]ontinued use by defendant of the infringing design after notice of ... charges of infringement con-

---

**18.** The following is an excerpt from the Greg deBruler deposition at 79, 80.

Q (by Mr. Ashton): Do you associate the quality of the products as between Marker bindings and the sailboards?

A (Greg deBruler): No, I think people probably do that. I don't....

Q: You'd acknowledge, would you not, that the normal consuming public might well associate the two?

A: With quality, sure.

Q: And indeed that might help you sell your product, might it not?

A: I would think so.

Q: Even though Hannes Marker is not associated with your company, correct?

A: No.

**19.** The excerpt below follows Greg deBruler's testimony concerning his exhibit at the ski show:

Q (by Mr. Ashton): Is there some kind of overlap between skiers and sailboard people?

A (by Greg deBruler): Sure, when the snow melts, what would you want to do?

Q: In fact, there is indeed a significant number of people who do both, is that right?

A: Absolutely.

Q: Do you trade off that to some extent?

A: Do we trade off?

Q: Do you use that in selling the Marker Surf product?

A: Well, not predominantly, no.

Q: You do to some extent?

A: I would say yeah, because the same folks.

stitutes evidence of intent to copy." *Restatement of Torts* § 716 (1938); *Fleischmann Distilling*, 314 F.2d at 157; *E.I. DuPont de Nemours & Co. v. Yoshida International, Inc.*, 393 F.Supp. 502, 514 (E.D.N.Y.1975).

Longstanding authority holds that injunctive relief is proper where a name or mark is arbitrary or fanciful and defendant could have no other purpose for the use of the name or mark than to benefit from the goodwill and reputation of the firstcomer. *Wall v. Rolls-Royce of America*, 4 F.2d 333 (3d Cir.1925); *Vogue Co. v. Thompson-Hudson Co.*, 300 F. 509 (6th Cir.1924), *reh'g denied*, 12 F.2d 991, *cert. denied*, 273 U.S. 706, 47 S.Ct. 98, 71 L.Ed. 850 (1926); *Dunhill of London, Inc. v. Dunhill Shirt Shop*, 3 F.Supp. 487 (S.D.N.Y.1929); *Tiffany & Co. v. Tiffany Productions*, 147 Misc. 679, 264 N.Y.S. 459 (1932) *aff'd* 237 A.D. 801, 260 N.Y.S. 821 (1932).[20] On facts close to the instant facts (concerning confusingly similar marks placed on non-competing goods), the *Rolls-Royce* court upheld the lower court's grant of injunction to the plaintiff with the following language:

> Indeed, from the standpoint of commercial integrity, fair business, and trade equity, ... the court below sitting in equity was justified in preventing the defendant from veiling his business under the name of "Rolls-Royce" for he had, and could have had, but one objective in view, namely, to commercially use as his own a commercial asset that belonged to others, the continued use and abstraction of which is so fraught with such possibility of irremediable injury that the only way to remedy it is to stop it at the start.

*Rolls-Royce*, 4 F.2d at 334.

The court finds that defendants' activities in this case fall squarely within the parameters of the activities enjoined in the above-referenced cases.

C. *The relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other.*

Before the court is a list of dealers in Marker Surf America products. It is clear that although some of the outlets for Marker Surf America products appear to be primarily concerned with the sailboard industry, a significant number of the retailers sell ski as well as sailboard equipment. The manner of marketing in both the ski and sailboard industry is similar: both employ sales representatives who visit retailers personally and advertise in sports-related publications, by private mailings, and at trade shows. The court finds that defendants' expenditure of time and resources to man a booth at the annual national ski show demonstrates defendants' perception that retailers of ski equipment are a desirable market outlet for their sailboards.

Also before the court are the affidavits of George Hasse and Duane Bush, retailers who sell both ski and sailboard equipment from the same sporting goods store. As stated above, both were initially under the impression that Marker International sponsored or was the source of Marker Surf America products. The court need not reach the strength of these affidavits in order to conclude that the use and manner of marketing the Marker Surf America sailboards is so closely related to the marketing of the Marker International ski equipment that defendants' marketing activity meets the third criterion of the *Beer Nuts* four-part analysis for determining likelihood of confusion.

D. *The degree of care likely to be exercised by purchasers.*

Plaintiff presents affidavits of retailers Hasse and Bush, which if true would support findings that actual confusion existed in the minds of sophisticated buyers, and in Bush's case, that passing off occurred.

**20.** Treated together, the well-known *Rolls-Royce, Vogue, Dunhill,* and *Tiffany* cases stand for the rule that confusion of source could be generated by the use of similar marks on goods which are not in competition but which are so related as to support a reasonable inference the goods originate from the same source. 3A R. Callmann, *supra*, at 25, § 21.12.

However, as stated above, plaintiff neither has the burden of showing actual confusion nor the mental impressions of sophisticated buyers. Rather, plaintiff bears the burden of showing "whether the ordinary purchaser with ordinary care and caution is likely to be confused" and that burden "should not be so high that the public is required to dissect and analyze trademarks in order to avoid confusion." *American Diabetes Ass'n, Inc. v. National Diabetes Ass'n,* 533 F.Supp. 16 (D.C.Pa.1981).

Defendants assert that in the absence of extensive marketing surveys it is impossible for this court to determine whether there is a likelihood that the public will be confused as to the sponsorship or source or the Marker Surf America products. Although such surveys could be useful, in this court's opinion, they are not vital to its determination of whether this criterion has been met. Indeed, where a likelihood of confusion is found under the principles set out above, a defendant may be enjoined from further use of the mark at issue even before the initial distribution of their goods bearing the infringing mark; it suffices that confusion is likely to occur. *Ortho Pharmaceutical,* 361 F.Supp at 1043.

Various courts that have considered 15 U.S.C.A. 1125(a) articulated the legislative intent underlying the statute as being simultaneously to accord legal protection to a property right which has been established in a given name and to insure that the public is not misled into purchasing or utilizing goods or services different from those sought. *Id.* at 1044; *Rolls-Royce,* 4 F.2d at 333; *T & T Mfg. Co. v. A.T. Cross Co.,* 587 F.2d 533 (1st Cir.1978). Addressing the issue of the nature of the evidence necessary to establish likelihood of confusion in the public mind, Professor Callmann states:

> It is of no probative value to ask a witness whether the defendant's trademark is likely to deceive the public. The court must exercise its own judgment ... customers are not ... readily available as witnesses ... [and] [i]t is of limited value

if a witness denies actual confusion or expresses a personal opinion to the effect that there is no likelihood of confusion. Even if true, such testimony does not preclude the possibility that there are others who have a different experience or who hold a contrary opinion as to the probability of confusion. The testimony of a few witnesses out of millions of consumers has been rejected as of small importance.

3A R. Callmann, *supra,* at 25, § 20.63. Accordingly, on review of the already compelling evidence of the similarity of appearance of the trademarks, defendants' clear intent to benefit from plaintiff's goodwill and reputation, and the parties' enjoyment of the same channels of trade, the court finds there is a likelihood that defendants' use of the Marker name and sloping "M" logo would create confusion as to source or sponsorship in the public mind.

## II. INJUNCTIVE RELIEF

On the strength of the foregoing reasoning and authority, it is this court's determination that plaintiff has met its burden of establishing that defendants' use of the name Marker Surf America and sloping "M" logo constitutes trademark infringement and unfair competition under 15 U.S. C.A. § 1125(a). Further, the court finds that defendants' use of the name and logo causes an immediate and irreparable harm to plaintiff for which injunctive relief is the sole adequate remedy at law.

Defendants assert that the court failed to consider the equities of this case, that is, did not properly weigh the hardship injunction would create for defendants against its benefit to plaintiff. The court takes cognizance of the fact that plaintiff has admitted it can show no present loss of sales as a result of defendants' activities. However, where likelihood of confusion has been found, plaintiff need not show immediate economic loss in order to obtain injunctive relief. 3A R. Callman, *supra,* at 25, § 20.07. The immediate harms to plaintiff include loss of control of the quality of the products that bear the Marker name

and potential dilution of its most valuable assets, i.e. the Marker name and related logos. *Id.*

Even in cases involving totally unrelated goods that bear similar marks, a defendant's continued use of a trademark that is likely to confuse the public as to source or sponsorship of the product

> will inexorably have an adverse effect upon the value of plaintiff's mark[,] and ... if he is powerless to prevent such use, plaintiff's mark will eventually be deprived of all distinctiveness.... The end result of this process is the kind of transformation of a distinctive trademark into a generic term or its transformation into the kind of weak or even totally nondistinctive mark.... Junior users may blur a mark's production identification or tarnish the affirmative associations a mark has come to convey.

*Id.*, § 21.11. It is no answer that defendants' products are presently of high quality because

> a plaintiff's reputational interest ... is not implicated only where defendant makes an inferior product. Since plaintiff can assert no control over defendant's business products, confusion between the two products allows the defendant to hold the plaintiff's reputation hostage, regardless of the relative quality of the products at the time of suit.

*S.C. Johnson & Son v. Johnson*, 116 F.2d 427 (2nd Cir.1940). This injury, the inevitable whittling away of its identity, entitles plaintiff to injunctive relief.

The court is not moved from its position by defendants' claim that an injunction will destroy their family business and waste their advertising resources.

> In passing upon the issue of confusing similarity of trademarks it is, in many cases, relatively insignificant what types of business are involved whether they differ in form or size, and where they are located.... It is never tenable as a defense to assert that the defendant's product is as good as, or even better than the plaintiff's ... It is insignificant which of the litigants is the more successful and which user had expended the greater sums in advertising, whether the litigants are manufacturers or dealers, whether they employ a particular method of marketing.

3A R. Callmann, *supra*, note 16, at 25, § 20.47.

It is often the case that defendants in trademark infringement and unfair competition cases are fledgling entrepeneurs who lack the business reputation necessary to market their products under a name that is unknown in their industry. As discussed above, one of the purposes of 15 U.S.C.A. § 1125(a) is to protect a senior user of a mark from a junior user's appropriation of the mark regardless of the junior's economic status. To give undue weight to the economic hardship injunction might create for defendants would be to violate the clear legislative intent behind the statute and undermine the body of decisional law related to trademark infringement and unfair competition.

Finally, the court agrees with the *Brooks Bros.* decision that "in the last analysis, what the courts have tried to do in each case involving unfair competition was to determine whether the particular action of a person was the decent thing to do in trade." *Brooks Bros. v. Brooks Clothing of California*, 60 F.Supp. 442 (S.D.Cal.1945) (Granted injunctive relief to plaintiff on facts similar to the instant facts, e.g. where defendant admitted intent to profit from the use of plaintiff's name). Defendants' activity in this case was clearly not "the decent thing to do in trade." The court notes that much of defendants' advertising carried personal endorsements from or references to Hannes Marker during the period before the termination of the Debco distributorship agreement. Such advertising would have been totally impermissible after the termination and, therefore, would have been of no use to defendants. Relinquishment of that advertising power was the natural consequence of Hannes Marker's withdrawal from his association with the deBrulers and Debco, and the court need not examine the effect on de-

fendants of the loss resulting from the termination. It is clear that even after receiving ample notice of the termination of the agreement and the likelihood that this action would ensue, defendants ordered large quantities of sailboards bearing the Marker name and logo from manufacturers completely unrelated to any Marker entity. Any loss of advertising costs or investment that defendant incurred after that termination and plaintiff's subsequent notices of objection to their use of the Marker name and the sloping "M" logo is of defendants' own creation, and this court cannot approve of defendants' dilatory and willful practices where the result thereof creates the likelihood of confusion requisite to sustaining plaintiff's request for injunctive relief. It is therefore the court's opinion that weighing of the parties' economic positions goes to the determination of damages rather than the propriety of enjoinment.

Under the terms of the injunction, defendants are hereby enjoined from selling or advertising for sale equipment that infringes plaintiff's trademarks. The court specifically orders that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of defendants, bearing the Marker name in any combination with the sloping "M" logo or other configuration, or any reproduction, counterfeit, copy, or colorable imitation thereof, and all plates molds, matrices, and other means of making the same, shall be delivered up and destroyed. 15 U.S.C.A. § 1118. Pursuant to 15 U.S.C.A. § 1116, defendants are further ordered to file with the court and serve on plaintiff within 30 days after service on defendant of this injunction, a written report, taken under oath, setting forth in detail the manner and form in which defendants have complied with the injunction.

### III. DAMAGES

Under 15 U.S.C.A. § 1117 and subject to principles of equity, plaintiff is entitled to recover (1) defendants' profits, (2) any damages sustained by plaintiff, and (3) costs of this action, and the damages may be tre-

bled at the court's discretion. A reasonable attorney's fee may be awarded in exceptional cases. Where plaintiff has not shown that defendants' activities have resulted in lost profits, any further hearing on damages will be narrowed to the issue of defendants' profits. The court is presently disposed to award costs of court to plaintiff and to require each party to bear their own attorney's fees; however, it will reserve final ruling on attorney's fees until further hearing.